[No. 43754. En Banc. May 4, 1978.]

SCOTT PAPER COMPANY, *Respondent,* v. THE CITY OF ANACORTES, ET AL, *Appellants.*

*Roberts, Shefelman, Lawrence, Gay & Moch, William N. Appel,* and *Stephen E. Mansfield,* for appellant City of Anacortes.

*Slade Gorton, Attorney General, Robert F. Hauth, Senior Assistant,* and *Donald Foss, Jr., Assistant,* for appellant State.

*J. P. Hunter* (of *Anderson, Hunter, Dewell, Baker & Collins, P.S.*) and *Robert Willoughby,* for respondent.

HOROWITZ, J.—This is a declaratory judgment action brought by the Scott Paper Company to determine the validity and effect of two contracts between the Coos Bay Pulp Corporation, the paper company's predecessor in interest, and the City of Anacortes. The principal question raised is one of statutory construction, that is, the power of the City to bind itself by contract for the sale of its water, where the contracts act as security for the issuance of municipal water revenue bonds. The court below upheld the contract terms as valid and binding, rejecting the City's attempt to impose a higher water rate than the one set by the contracts. We affirm.[1]

The 1955 and 1957 contracts between the City of Anacortes and the Coos Bay Pulp Corporation which are in question here were entered into at a time when the City was executing a plan for improvements and extensions to its municipal water supply and distribution system. A series of ordinances passed between 1952 and the date of the first contract with Coos Bay in 1955 expressed the City's intention to make the improvements, authorized the issuance of up to $1.6 million in water revenue bonds to fund the improvement scheme, and provided for the issuance of one-half million dollars in bonds, Series A–1, for that purpose in 1955. The City also imposed fixed charges on consumers not on the existing pipeline to cover some portion of the cost of extending the pipeline, distinguishing payment of

---

[1]Additional questions involved are later included in the introductory summary of issues and their disposition preceding the detailed discussion of the issues.

water rates from these capital contributions. The Coos Bay Pulp Corporation, predecessor in interest of respondent Scott Paper Company, was to benefit from the scheme by installation of a water pipe to its property line.

In January 1955 the City and Coos Bay entered into the first of the two contracts. In this first contract the City agreed to furnish Coos Bay up to 170 million gallons of water per month. In exchange Coos Bay agreed to pay a minimum monthly sum of $3,000 for the water it received, plus 3.9 cents per 1,000 gallons for the excess over 60,000 gallons delivered per month. In the event it defaulted or unilaterally terminated the agreement, Coos Bay promised to pay a fixed sum up to $376,000, which was the estimated cost of installing the facilities necessary to provide it with water. The water rate could be renegotiated at Coos Bay's request should the rate stipulated provide the City with more than a fair and adequate return. Coos Bay also promised to pay for any water filtration and treatment facilities the City was required to build in order to continue furnishing it with the quality water it needed. The initial term of the contract was 25 years.

This contract was an essential and integral part of the City's plan for improving its water system. The assured proceeds from the monthly payment and liquidated damages provisions of this contract, along with those from another large industrial user contract, were necessary security for the issuance of a second series of city water revenue bonds, Series A–2, in 1955. It is reasonable to conclude from the evidence that both parties knew the bonds could not be issued without this agreement. It is also reasonable to conclude that both parties knew the proceeds of the contract would be allocated in part to special funds for retiring the bonds, in view of the short period of time elapsing before enactment of the bond ordinance. Two months after the Coos Bay contract was signed (as contemplated it appears, by the parties), the City passed ordinance No. 1158, providing for the issuance of the Series A–2 bonds. Section three of that ordinance created a special

sinking fund for the sole purpose of retiring Series A bonds. Under the terms of section three, annual contributions from the income from the Coos Bay contract were to be paid into this fund. Likewise, any liquidated damages paid by Coos Bay upon default or termination, a liability up to $376,000, were to be paid into the fund. In that same year Coos Bay Pulp Corporation, relying on its water supply contract, increased production and made capital expenditures of approximately $675,000. At the time the contract was entered into, water rates applicable to regular users were set by ordinance.

The 1955 contract expressly provided for construction of water filtration and treatment facilities should Coos Bay require treated water. Coos Bay agreed to pay its pro rata share of construction costs of such a plant, based on the capacity of the facilities and the portion of treated water consumed by Coos Bay, or the entire cost if the plant served only Coos Bay. It also agreed to pay its pro rata share of filtration and treatment costs. Its liquidated damages liability in the event of default or termination was increased to cover its share of plant construction costs, the amount of which was not then known.

Construction of this significant addition to the municipal water system did become necessary. In 1957 the City undertook a new funding scheme to provide a plant which apparently was to serve the entire municipal water system. A new series of water revenue bonds, Series B, was to be issued to pay for constructing and equipping the plant. As part of the security for these new bonds, a supplemental water contract between the City and Coos Bay was negotiated which ensured a greater water supply to Coos Bay and a higher minimum monthly payment to the City. A small fraction of this payment was set aside as a fixed expense to defray costs and debt service, a provision which was also a feature of the first contract. Coos Bay's liquidated damages obligation was increased to a maximum of $475,000. The option to request renegotiation of rates was made available to both parties, to ensure that the City earned a fair and

adequate return. The first renegotiation period was to occur in 1960.

On May 21, 1957, the City Council voted to execute the proposed supplemental contract. At the same meeting the Council voted to accept an offer from a named underwriter to purchase the proposed bonds. That offer was conditioned in part on execution of the supplemental contract with Coos Bay, along with contracts with two other large users, "substantially as presented." These contracts were necessary for retirement of the bonds; therefore, the bonds could not have been sold without the firm promise of Coos Bay to fulfill its obligations under the contract.

Shortly thereafter, as contemplated by the parties, City ordinance No. 1218 was passed, providing for issuance of the Series B water revenue bonds. The ordinance created a bond redemption fund. Proceeds from the supplemental contract with Coos Bay were to be paid into this fund to defray both capital costs and debt service in connection with the new plant. Certain of the funds from the original contract were also to be paid into a new sinking fund. Ordinance No. 1218 referred specifically to the contracts with Coos Bay as "important and valuable security" for the revenue bonds.

In 1957 respondent Scott Paper Company, hereinafter referred to as the Paper Company, became successor in interest to the rights of the Coos Bay Pulp Corporation under the contracts. The 1960, '65, and '70 negotiation times provided in the supplemental contract all passed without action by either party. City water rates applicable to regular water users, but never applied to Coos Bay or the Paper Company, were changed by ordinance in 1958 and 1971. In 1973, approximately 20 months before the 1975 renegotiation period was to commence (as the contract with the Paper Company provided), the City took several actions which are the basis of this suit. City ordinance No. 1603 amended city water rates once again. Ordinance No. 1607 imposed a water utility tax on the gross income of the city water system at the rate of 7 percent. Beginning December

1973, the City billed the Paper Company in accordance with the rates set by ordinance, that is ordinance No. 1603 and its predecessors, retroactively through October 1970. Never before had the Paper Company been billed according to the rate set by ordinance. The City thus claimed an amount due, in arrears, of approximately $474,000. Subsequent billings also showed a surcharge covering the 7 percent utility tax, a new charge to the Paper Company not contemplated by the terms of its contract with the City. The City had apparently taken the position it could alter the price term of its contracts unilaterally without disturbing the Paper Company's obligations with regard to minimum monthly payments and liquidated damages.

The Paper Company thereafter instituted this action for declaratory judgment against the City and the State, alleging that application to it of the rate and utility tax ordinances unconstitutionally impaired its contracts with the City. The Paper Company further alleged that RCW 35.92-.010, amended in 1959 to require that no water rate be charged which is less than the cost of the water and service, could not constitutionally be applied to its contract with the City. The City and State counterclaimed to recover the amount allegedly due under the ordinances. They contended that the contract rate was less than cost, in violation of RCW 35.92.010, and, therefore, some of the water furnished at that rate was a gift by the City in violation of Const. art. 8, § 7, which prohibits the giving of gifts by a municipality.

At trial the Paper Company's motion for summary judgment was granted. The court held that the City rate and tax ordinances could not constitutionally be applied to the Paper Company, because to do so would impair the obligations of its contracts with the City in violation of the state and federal constitutions. It held the amendment to RCW 35.92.010 could not be applied to these contracts because it was not to be retroactively applied to contracts executed before the date of the amendment. It further held that compliance with the contract price terms was not a gift in

violation of the state constitution, notwithstanding the uncontroverted fact that, at least since November 1, 1973, and for an undetermined period before that date, the cost to the City of furnishing water to the Paper Company has been greater than the rate specified by the contracts. The court held the parties were bound by the terms of the contracts, and the counterclaims of the City and State were dismissed. Although the court did not find it strictly necessary to reach the issue, it also held that both the City and the State were estopped to claim any price in excess of the contract rate prior to the time the City gave notice of its intent to charge a higher price for its water. The City and State now appeal from the summary judgment. We affirm for the reasons discussed hereafter.

The issues raised by this appeal can be grouped under four general questions which will be discussed in detail below. The questions and our holding will be summarized here. The first question is whether a third class municipality has the authority to enter into a contract to sell water at a fixed rate, where the proceeds from the contract are necessary for the issuance of bonds for improvements to the city water system, and where the consideration given for the water furnished far exceeds the promise to pay a stipulated rate. We hold that it does.

The second question is whether the rates set by the contracts here are valid under the state constitutional prohibition against the giving of gifts by a municipality, and the statute prohibiting the sale of water at less than cost. We hold the contract rate is valid, that it is not a gift, and that it is not subject to the statutory prohibition enacted after execution of the contracts.

The third question is whether the City, under the circumstances here, could unilaterally impose new rates set by ordinance on the Paper Company. We hold it could not for two reasons. First, the rate ordinances applied by the City were not retroactively applicable to contracts executed prior to their effective dates. They therefore had no application to the existing contracts between the City and the

Paper Company. Second, although the City could constitutionally alter a term of its contract when absolutely necessary to preserve the financial health of its water system, it could do so only within certain limits. The City exceeded those limits here, and its action cannot be upheld.

In view of the disposition we make of this issue, finding no liability on the part of the Paper Company for higher water rates, we find it unnecessary to reach the estoppel issue raised by the parties. Nonetheless, we would point out we agree with the ruling of the court below on this question. The court ruled that the City was estopped to claim a higher price by the Paper Company's reliance on the contract terms, setting the rate and providing for rate renegotiation at the request of the City, in establishing its own costs and the selling price of its products. The court further found the State estopped because although it was not a party to the contracts, state auditors had failed to find and bring to the attention of the City or the Paper Company the fact that water sales were below cost. It should also be noted that, while the State claims it has a standing to assert its counterclaim under RCW 43.09:260, no malfeasance, misfeasance or nonfeasance has been shown, as required by that statute. See definition of those terms in *Berge v. Gorton,* 88 Wn.2d 756, 567 P.2d 187 (1977). The State thus has no legal basis on which to maintain its counterclaim.

The final question is whether the City can impose a water utility tax on the contract purchaser where the tax is not a part of the contract price. We hold the passing on of the utility tax to the Paper Company, a consumer, was not an exercise of the City's police power and therefore cannot be upheld.

These questions shall be discussed in the above order.

I. *Validity of the contracts.*

The threshold question in this case is whether the City of Anacortes, a third class municipality, had the authority to enter into the contracts with Coos Bay where the rate to be

charged for municipal water was fixed by the parties, and the entire agreement was an integral part of the capital funding scheme for improvements to the City's water system. The City does not claim the contracts as a whole are invalid, but only that the price term is subject to unilateral change by the City. The State, however, claims the City had no power to enter into the contracts, and that they are therefore void.

The general grant of authority to cities and towns to acquire, operate and maintain municipal waterworks is found in RCW 35.92.010. The predecessor of this statute in effect at the time these contracts were entered into was Laws of 1951, ch. 252. It granted, as does the modern statute, "full power to regulate and control the use, distribution, and price [of municipal water]." Laws of 1951, ch. 252, § 1, p. 791. This "full power" clause gave the City ample authority to enter into binding contracts to supply Coos Bay with municipal water. The power to contract is an implied incident to the full power granted to regulate the use and distribution of municipal water. *See* 10 E. McQuillin, *Municipal Corporations* § 29.05, at 230 (3d ed. 1966) (hereinafter referred to as McQuillin). Furthermore, a municipality owns and operates its public utilities in a proprietary rather than governmental capacity. 12 McQuillin § 35.35, at 465. *See Shandrow v. Tacoma,* 188 Wash. 389, 62 P.2d 1090 (1936). The obligation of the City, where it contracted in its proprietary capacity, is the same as that of a private individual or corporation. 10 McQuillin § 29.05, at 230. The binding nature of these features of the contracts is therefore evident.

With regard to the rate feature of the contracts, though, the inquiry into statutory authority must be more extensive, for fixing water rates for municipal water is normally a legislative and governmental act. 12 McQuillin § 35.37, at 479. *See State ex rel. Haas v. Pomeroy,* 50 Wn.2d 23, 308 P.2d 684 (1957). The power to fix utility rates by contract must therefore be quite clear. *See Western States Util. Co. v. Waseca,* 242 Minn. 302, 65 N.W.2d 255 (1954); *Ottumwa*

*Ry. & Light Co. v. Ottumwa,* 173 N.W. 270 (Iowa 1919); *Trustees of Illinois Cent. Hosp. v. Jacksonville,* 61 Ill. App. 199 (1895).

The City's authority to contract to supply water at a fixed price in this case is derived from a second statute in effect in 1955 and 1957, that is Laws of 1917, ch. 124.[2] This statute relates to the powers of third class municipalities to acquire and maintain public utilities in general. Section 16 specifies procedures for raising capital,[3] and specifically authorizes the issuance and sale of utility bonds to pay the original cost of utility plants and systems. Laws of 1917, ch. 124, § 16, p. 496. This grant of authority would be meaningless without necessarily implied power to do whatever is reasonably and lawfully necessary to make such bonds sound and salable. It is this power to issue and sell utility bonds that carries with it the authority to enter into binding contracts, including contracts for the sale of municipal water at a fixed price, which provide the essential security to make the bonds sound. Analysis of the remainder of the statute reinforces this conclusion.

Section 16 controls certain aspects of municipally owned utility operation, specifically defining maintenance and operation costs and requiring these costs to be paid from earnings. It further requires that "[r]ates shall be fixed by ordinance for supplying . . . water . . . sufficient to pay all operating and maintenance charges". Laws of 1917, ch. 124, § 16, p. 496. The definition of maintenance and operation costs includes interest on debts incurred in acquiring, maintaining and operating municipal facilities but does not include the principal of those debts.

Thus, while rates fixed by ordinance must be sufficient to pay all maintenance and operation costs, payment of the principal indebtedness incurred for acquiring public water facilities is not governed by this particular provision. This

---

[2] Portions of this statute are presently enacted in RCW 35.24.430.

[3] Procedures for issuance of utility revenue bonds are now found in RCW 35.92.100.

is the position taken by the City, and we agree. The specification of rates set by ordinance for one aspect of utility funding only reinforces our conclusion that the City was empowered to enter into contracts securing the principal indebtedness, and to set rates to be charged for municipal water in those contracts. We emphasize that the City's contracts with Coos Bay were the very heart of the principal debt repayment scheme. The bond ordinances required substantial portions of the proceeds to be paid into funds for retiring the bonds. Furthermore, the bonds would not have been salable had the contracts not been executed. We therefore conclude the City had the authority to bind itself by contract to sell water to Coos Bay at a fixed price.

Appellant State of Washington points to RCW 35.92.200, which specifically authorizes cities to contract for the sale of water outside their boundaries, as evidence that the City had no authority to make such a contract with customers within its boundaries. We find this argument unpersuasive. The history of RCW 35.92.200 indicates that its specific grant of authority was intended to resolve the question whether a municipality could supply water to extra–territorial customers at all, and was not intended to qualify or limit in any way the authority a municipality may exercise within its boundaries.

While we hold that the City was not required to set the rate to be charged Coos Bay by ordinance, we note that in fact the terms of both contracts were enacted into ordinance.[4] City ordinance No. 1158 specifically referred to the 1955 contract with Coos Bay in the section creating the sinking fund, Section 3. City ordinance No. 1218 referred to both the 1955 and 1957 contracts, requiring income therefrom to be paid into two newly created funds, and reciting that the contracts were "important and valuable security" for the Series B revenue bonds. Public documents such as

---

[4] Enactment of the terms of a contract by adoption by reference, as described here, is to be distinguished from the process of ratification. A contract which is ultra vires for want of authority on the part of the municipality to enter into such a contract cannot be ratified. *State v. Pullman,* 23 Wash. 583, 63 P. 265 (1900).

these contracts may be adopted and made a part of an ordinance which makes reference to it. *See Friedman v. Goodman*, 219 Ga. 152, 132 S.E.2d 60 (1963). This doctrine of adoption by reference applies where the public document is adequately identified "so that there is no uncertainty as to what was adopted." *Friedman v. Goodman, supra* at 160. We find that the references to the Coos Bay contracts in the City ordinances fully and adequately identified those contracts.

More important, it was clearly the intent of the City to make these contracts a feature of the bond ordinances, for they were necessary security for the issuance of the bonds. The parties appear to have contemplated that the terms of the contracts would be incorporated into the bond ordinances. Execution of the contracts and enactment of the ordinances were different stages of the same transactions. We conclude that even if the rate feature of the water supply agreement had to be set by ordinance, the incorporation of these contracts into the City's bond ordinances was adequate to legislatively enact the rate term under the doctrine of adoption by reference.

We therefore hold that the City had the authority to enter into its contracts to supply the Coos Bay Pulp Corporation with municipal water at a specified rate, and those contracts are valid.

II. *Validity of the contract rate under Const. art. 8, § 7 and RCW 35.92.010.*

The State contends the rate set by the Coos Bay contracts is invalid because it is less than the cost to the City of furnishing the water. The sale of water at a rate below cost, it is argued, violates both the requirement of RCW 35.92.010 that no rate be charged which is less than the cost of the water and service, and the constitutional prohibition against the giving of gifts by a municipality.

The statutory prohibition against the sale of water at less than cost was added to the general grant of authority to acquire, maintain and operate waterworks in 1959.

Laws of 1959, ch. 90, § 6. This amendment was enacted 4 years after the original contract between the City and Coos Bay, 2 years after the supplemental contract. Statutes are generally presumed to operate prospectively. *Godfrey v. State,* 84 Wn.2d 959, 530 P.2d 630 (1975). They will not be given retroactive effect where the result would be to impair the obligation of a contract. *Gillis v. King County,* 42 Wn.2d 373, 255 P.2d 546 (1953); *In re Estate of Heilbron,* 14 Wash. 536, 45 P. 153 (1896). The legislature expressed no intent that the amendment prohibiting the sale of water at less than cost be applied retroactively to preexisting contracts. The result of such an application would be to vitiate a crucial aspect of the Coos Bay contract. We decline to interpret the statute as having retroactive application, and hold it has no application to the Coos Bay contracts.

The State argues, however, that this statutory amendment merely defines the meaning of a gift for the purposes of Const. art. 8, § 7. When a municipality sells water at a rate lower than the cost of furnishing the water, the water actually furnished in excess of the amount of water for which the payment fully reimburses the City is said to be a gift. The State contends the contract rate is a per se violation of Const. art. 8, § 7 and that RCW 35.92.010, by prohibiting the sale of water at less than cost, defines a gift for purposes of the constitution. We disagree.

■ Under the circumstances of this case there was ample consideration flowing between the parties at the time the contracts were entered into. There is no proof the City did not receive a "fair and adequate" return for its water at the time the rates were established by the 1955 and 1957 contracts, or at any specifically determined time thereafter until November 1973. Furthermore, the promises of a minimum monthly payment and contribution towards the cost of filtration and treatment facilities were additional and important consideration in and of themselves, enabling the City to issue and sell its water revenue bonds. Adequate consideration may preclude the finding of a gift. *See Washington Natural Gas Co. v. PUD 1,* 77 Wn.2d 94, 459

P.2d 633 (1969). Furthermore, if intent to give a gift is lacking the elements of a gift are not present, and article 8, section 7 does not apply. *See State ex rel. Madden v. PUD 1*, 83 Wn.2d 219, 517 P.2d 585 (1973). No intent to give a gift is apparent from the facts of this case. Indeed, the City fully expected to profit admirably from its agreements by constructing new facilities. We therefore find no gift in violation of Const. art. 8, § 7.

Moreover, RCW 35.92.010 does not, and cannot define a gift for purposes of the constitutional provision. The statutory amendment does not by its terms purport to define the meaning of the word "gift." The term does not even appear in the statute. In any event no legislative attempt to define the word would be meaningful. The construction of the constitution is a judicial function. As such it is exclusively the function of the courts under Const. art. 4, § 1. The legislature has no power to define the meaning of a constitutional provision. *State ex rel. Munro v. Todd*, 69 Wn.2d 209, 417 P.2d 955 (1966); *State Highway Comm'n v. Pacific Northwest Bell Tel. Co.*, 59 Wn.2d 216, 367 P.2d 605 (1961). RCW 35.92.010 cannot properly be construed as defining the meaning of a gift under Const. art. 8, § 7.

We therefore hold that the contract rate agreed to by Coos Bay and the City of Anacortes violates neither Const. art. 8, § 7 nor RCW 35.92.010 and is valid.

### III. *Imposition of a new rate set by ordinance.*

The City contends that the rate agreed to in its contracts with Coos Bay was subject to the necessary and reasonable exercise of its police powers, and it could therefore impose a new rate set by ordinance without unconstitutionally impairing the obligations of the contracts. The City's unusual position is that it can unilaterally alter the price term of the contract for the sale of a commodity without affecting the binding nature of all other features of the agreements. Respondent Paper Company, on the other hand, maintains the unilateral imposition of a new rate does impair the City's contract obligation, violating the

state and federal constitutions. We find the City's action in applying the ordinance rates to the Paper Company invalid for the following reasons.

First, the City applied, to the Paper Company's purchase of municipal water, ordinances which, by their own terms, had no application to the 1955 and 1957 contracts. The City alleged in its counterclaim that the Paper Company had been receiving water at a rate less than cost commencing at some date after 1957. The only evidence relating to such a discrepancy between rate and cost was (1) an unchallenged affidavit alleging the cost had exceeded the rate since November 1973, and for an undetermined period before that date, and (2) the City's schedule of the Paper Company's water consumption, actual charges, and charges which would have been made under existing ordinances between October 1970 and October 1973, which was included in the December billing and attached to the original complaint. The trial court specifically found there was no proof the costs to the City exceeded the contract rate at the time the contracts were entered into. The City chose to claim amounts due in arrears to October 1970, and we will therefore look to the ordinance in effect at that time, and succeeding ordinances, to determine their applicability to the Paper Company.

The ordinance setting rates for consumers of filtered water which was in effect in 1970 was ordinance No. 1233, enacted in April 1958. That ordinance fixed the date at which it would take effect as 5 days after its publication. It does not purport to have retroactive application to contracts entered into prior to its effective date.

The rates were amended by ordinance No. 1540 in March 1971, just 6 months after the City claims excess charges against the Paper Company began to accrue. This ordinance remained in effect until November 1, 1973, 1 month prior to the billing of the Paper Company for charges in excess of the contract rate. Yet this ordinance, by its own express terms, had no application to rates charged to

industrial consumers. Section 3 of ordinance No. 1540 states:

> Rates for use by industrial contract consumers shall be established by agreement between the City of Anacortes and the industrial consumer desiring the service.

The City is therefore precluded from applying rates set by this ordinance to the Paper Company by the very terms of the ordinance.

Significantly, ordinance No. 1603, enacted in 1973 just 1 month before the billing of excess charges to the Paper Company, omits this clause and enacts new rates applicable to "all consumers within the corporate limits." Ordinance No. 1603 was not to take effect prior to November 1, 1973. Again, this ordinance does not purport to have retroactive application to contracts executed prior to its effective date, although it may be fair to conclude from the circumstances that the city water department desired it to have such an effect.

Wishing it does not make it so. Ordinances, like statutes, are legislative enactments. They are presumed to have prospective application. Absent a clear expression of intent that they be retroactively applied, it would be improper to do so. Even were such an intent manifest though, a legislative enactment will not be given such effect when to do so would impair the obligation of a contract. *See Gillis v. King County, supra.* The ordinances here express no intent on the part of the City Council that they be applied to preexisting contracts. The ordinance in effect during most of the relevant period precludes its application to these contracts by its very terms. We therefore hold the City had no authority to apply the rates set by these ordinances to the Paper Company.

The question remains whether the City had the power to impose any rate higher than the contract rate and, if so, if that power was properly exercised in this case.

We have already said the contracts between the City and Coos Bay were valid and binding. The City claims, however, its water utility was sustaining substantial losses on

its sale of water to the Paper Company. Its evidence on that point was confined to the above–mentioned allegation that its costs exceeded the contract rate at least beginning in November 1973. No exact figures for losses allegedly sustained prior to that time have been put forward. In fact, no evidence was introduced regarding the quantity of water the City has supplied to the Paper Company during the life of the agreement, the cost to the City of supplying that water, or the total amounts paid by the Paper Company.

■ The United States Supreme Court has held that the economic welfare of a governmental entity may justify the exercise of its police power by altering a contract term without violating the contract clause of the United States Constitution. The court said in *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 437, 78 L. Ed. 413, 54 S. Ct. 231 (1940):

> The economic interest of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.

The circumstances allowing the exercise of the state's police power in that case were critical to the result. The Minnesota legislature had declared a public economic emergency to exist, one which threatened many property owners with loss of their property through mortgage fore-closures. The legislature had enacted a law extending the period of redemption for such mortgages for the duration of the emergency. The court noted that the integrity of the mortgage indebtedness was not impaired by the statute. Furthermore, the mortgagor in default was required to pay the rental value of the property while he remained in pos-session. Numerous other features of the law also protected the interests of the mortgagee for the duration of the emergency.

The Supreme Court upheld the statute. The underlying rationale of its opinion was that the contract clause must be harmonized with the exercise of the police power to safe-guard the vital interests of the people. *See Home Bldg. & Loan Ass'n v. Blaisdell, supra* at 434. It does not violate

the true intent of the constitution, the court held, to exercise the police power by

a temporary and conditional restraint, where vital public interests would otherwise suffer.

*Home Bldg. & Loan Ass'n v. Blaisdell, supra* at 440.

Measured against this standard, the act of the City of Anacortes greatly exceeded the limits of the proper exercise of the police power. Far from protecting the vital interests of its citizens, the City's conduct in violating its contract with Coos Bay threatened to undermine the security of its utility bonds and thus its power to raise revenue for needed improvements to the City. The City's action would have denied the Paper Company the essential consideration it bargained for—a fixed and certain price for its water supply. A breach which is so material as to amount to a substantial or total failure of consideration could have been a cause for repudiation of the contract. *Cartozian & Sons, Inc., v. Ostruske–Murphy, Inc.,* 64 Wn.2d 1, 390 P.2d 548 (1964). Such breach and repudiation of these contracts would have had severe consequences for the City. The Paper Company was bound by the contracts to make large minimum monthly payments for its water supply, substantial portions of which were paid into bond retirement funds. In the event it defaulted the Paper Company was bound to pay a large sum in liquidated damages which again would have been paid into bond retirement funds. The significance of these contracts for the security of the City's water utility bonds must not be underestimated. The City's own comparative operating statement on its water department for the years 1963–1968 shows that in each of those years but one the revenues from the three leading industrial water consumers alone (the Paper Company in most years being the greatest consumer) were more than sufficient to pay the debt service for that year. This statement was included in a prospectus circulated in connection with new bonds issued in 1969, and was intended to demonstrate the sound financial basis of the City's bond

indebtedness. Any act which threatened this security can hardly be seen as one protecting the vital interests of the City.

Other significant circumstances present in the *Blaisdell* case are absent here. In contrast to the emergency declared by the legislature to exist in Minnesota, Anacortes faced no calamity in the fall of 1973. Its contracts provided for renegotiation of rates at regular 5 years intervals (the next being in 1975), with the express purpose of providing the City with a fair and adequate return. Furthermore, in contrast to the action taken by the Minnesota legislature, the City of Anacortes took no precautionary measures to avoid unnecessary harm to the interests of a party whose contracts with the City were used by it to assure payment of the water utility bonds through the guaranteed proceeds of those contracts.

We conclude the City greatly exceeded the permissible exercise of its police power by attempting to impose higher rates on the Paper Company. The appropriate step was to renegotiate rates as provided in the contract to ensure a fair and adequate return to the City. The action of the City in imposing a higher rate for its water on the Paper Company was therefore invalid.

IV. *Imposition of utility tax surcharge.*

City ordinance No. 1607, passed in November 1973, imposed a water utility tax on the gross income of the city water system at the rate of 7 percent. This tax was passed on to all consumers effective December 1973 in the form of a surcharge, and was reflected on subsequent billings to the Paper Company.

We agree with the City's contention that the utility tax ordinance was passed as a valid exercise of its taxing powers. However, the tax was levied against the water utility itself, not against water consumers. The decision of the water utility to pass the tax on to consumers in the form of a surcharge was not authorized by the ordinance and was not an exercise of the City's taxing powers. It was therefore

improper to impose this additional charge, not contemplated by the contracts, on the Paper Company. The utility's action imposed an additional burden on the Paper Company, thereby altering its obligation under the contracts in violation of the impairment of contract clauses of the federal and state constitutions. U.S. Const. art. 1, § 10; Const. art. 1, § 23. We therefore hold the imposition of the utility tax surcharge on the Paper Company invalid.

The judgment of the trial court is affirmed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, and DOLLIVER, JJ., concur.