**CITY OF TACOMA, DEPARTMENT OF PUBLIC UTILITIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–816C.

United States Court of Federal Claims.

June 22, 1993.

Mark Bubenik, Tacoma, WA, attorney of record for plaintiff. G.S. Karavitis, of counsel.

Ellen M. McElligott, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Bryan R. O'Boyle and Capt. Terrie M. Gent, Air Force Legal Service Agency, of counsel.

### MEMORANDUM OF DECISION

HARKINS, Senior Judge:

Plaintiff's claims are before the court on cross-motions for summary judgment. Oral argument was heard on June 10, 1993; bench rulings were made and stated on the record at the close of argument. Reasons for the rulings follow.

Plaintiff's claims arise from a contract dated November 20, 1972, for the purchase of electrical services for McChord Air Force Base (McChord AFB) from the City of Tacoma, Department of Public Utilities, Light Division. Under previous contracts, plaintiff supplied electrical services to the United States for the military installation at McChord Field since at least 1945.

The contract was for an indefinite term. The schedule in item II provided:

II. TERM. This contract shall continue in effect until terminated at the option of the Government by the giving of written notice not less than 30 days in advance of the effective date of termination.

General Provision No. 2, provided the Government would pay for all services at rates specified in Rate Schedule E–4 attached to the contract. Rate changes were made part of the contract by amendments that deleted a current rate schedule and incorporated a new rate schedule.

The General Provisions provided rate changes would be renegotiated and would become effective as mutually agreed:

3. CHANGE OF RATES

At the request of either party to this contract with reasonable cause, the rates set forth herein shall be renegotiated and the new rates shall become effective as mutually agreed PROVIDED that any rates so negotiated shall not be in excess of rates to any other customer of the Contractor under similar conditions of service.

No increase shall be requested in the contract rate unless the Contractor has placed into effect a general rate increase to all of his customers under similar conditions of service. If the Contractor has placed into effect a general rate decrease, a corresponding decrease in the contact rate shall be made.

Pursuant to this procedure, the parties by bilateral modifications to the contract agreed upon nine rate changes during the period 1973–77.

The General Provisions included the January 1958 version of the Disputes article, which included:

... Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision....

and

(c) The provisions of (a) above shall not apply to disputes which are subject to the jurisdiction of a Federal, State, or other appropriate regulatory body. The

provisions of (a) above shall also be subject to the requirements of the law with respect to the rendering of utility services and the collection of regulated rates. (1968 SEP)

Modification No. 3 (P00003 or Mod 3) signed by the City's Mayor on April 1, 1980, and by the Contracting Officer (CO) on April 7, 1980, in addition to changes in rates, deleted General Provision No. 10, Disputes, and replaced it with a new Disputes article that contained subparts (a) through (f). Subpart (a) provided:

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601, et seq.). If a dispute arises relating to the contract, the contractor may submit a claim to the Contracting Officer who shall issue a written decision on the dispute in the manner specified in DAR 1–314 (FPR 1–1.318).

Subpart (b) defined the term "claim"; subpart (c) provided for certification of disputes exceeding $50,000; subpart (d) provided for payment of interest on amounts found due on claims from the date the CO received the claim to the date of payment; and subpart (e) provided the decision of the CO would be final and conclusive unless an appeal or action "is timely commenced within the times specified by" the Contract Disputes Act (CDA).

Subpart (f) provided:

The contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action related to the contract, and comply with any decision of the Contracting Officer.

By Ordinance No. 24050, effective April 20, 1988, the City established new electric service rates. Schedule E–2, applicable to McChord AFB, established new rates for the period April 10, 1988, to March 1, 1989, when the schedule would be discontinued. Schedule G established new rates that would apply to McChord AFB after March 1, 1989.

The Air Force paid electricity invoices for April and May 1988 at the new rates established in Ordinance No. 24050. On July 27, 1988, the CO advised the City that the invoices had been paid at the new rates through administrative error, that the new rate schedule had not been incorporated in the contract, and that the amount overpaid would be offset against the next billing. Thereafter, the Air Force withheld payments for electricity pending review of the new rate schedules and modification of the contract.

By letter dated December 20, 1988, the CO advised the City the new rate schedule G–1 did not take into account differences in service conditions between customers that owned and maintained their own distribution systems and thus was discriminatory. The CO asserted the new rate schedules would not become effective until renegotiated and mutually agreed. The letter acknowledged that the old rate schedules were valid, that an increase in electrical rates were due, and requested additional information for negotiations.

Thereafter representatives of the parties met in numerous negotiating sessions. The CO withheld payment on all invoices, but continued to agree that the new rates in schedule E–2 were reasonable and that they would be incorporated in the contract when there was mutual agreement on all rate schedules. The City throughout contended the rates established by Ordinance No. 24050 were valid and applicable to the electricity provided to McChord AFB.

The CO in a letter dated January 10, 1990, and the Base Commander in a letter dated March 22, 1990, emphasized that a negotiated settlement would be preferable to resolution through the Disputes article. On March 1, 1990, the CO, to avoid litigation proposed a payment based on the following schedules:

—for the period 10 April 1988 thru 31 January 1989 under Phase I and Phase II of Rate Schedule "E–2" as implemented by your Ordinance 24050.

—for the period 1 February 1989 thru 30 June 1989 under Rate Schedule "G" as implemented by your ordinance 24050.

—for the period 1 July 1989 thru 2 April 1990 under your "CP" Rate Schedule.

The March 1, 1990, proposal provided a total $611,336 for electricity through March 1990. In a letter dated March 13, 1990, the City offered to settle for $678,000.

The City enacted Ordinance No. 24584, effective April 2, 1990. This ordinance incorporated a new rate schedule G, with an applicable 10.3 percent discount to the monthly bill.

By letter dated April 10, 1990, the CO refused to accept the City's $678,000 proposal on the ground that it included payment of "late charges" and an unacceptable portion of the disputed amount. The CO renewed the March 1, 1990, offer and contended it would be a fair settlement. The letter included:

> The monetary settlement is based upon your existing rate structure and your oft stated offer to give the Air Force your "CP" rate schedule retroactive to 1 Jul 1989. While it would require the Air Force to pay a portion of the disputed amount, we are willing to do this in order to avoid the costs and disruptions that litigation would entail.
>
> I recommend you give this settlement proposal your full consideration. In making your decision you should consider that your inclusion of a "discounted" G schedule in your April 1990 rate Ordinance amounts to a de facto admission that the April 1988 rate Ordinance discriminated against the Air Force and like customers who own and maintain their own power distribution systems.

On May 11, 1990, the City submitted a duly certified claim to the CO for the amount owed as of March 30, 1990. The amount claimed to have been accumulated since April 10, 1988, was described as:

| | |
|---|---|
| Undisputed Amount | $532,180.55 |
| Disputed Amount | 218,238.50 |
| Late Payment Charges | 69,865.12 |
| | $820,284.17 |

On June 12, 1990, the CO by "unilateral modification to the contract" (Modification No. 14 or Mod 14) issued a final order under the Disputes article. Mod 14 reimbursed the City, by incorporation of schedule E–2 of Ordinance No. 24050 into the contract, for undisputed amounts withheld during the period April 10, 1988, through April 1, 1990, totaling $531,376.35.

The complaint was filed on August 23, 1990. Thereafter the City on September 24, 1990, submitted a second certified request for a final decision by the CO that asserted a right to terminate forthwith electric service to McChord AFB. The letter stated a short extension of service would be favorably considered to enable McChord AFB to find an alternative source of service. On October 5, 1990, the CO issued a second final decision that declared the City had no right to terminate service and directed the City, pursuant to the Disputes article, to continue performance and comply with the terms and conditions of the contract. An amended complaint was filed October 15, 1990. Count Four asserted the contract should be declared to be breached and of no further force and effect.

---

Both parties agree the central issue in this case is the validity of the 1972 contract, as amended in 1980 by Mod 3. Plaintiff contends the contract as amended: (a) is contrary to federal law enacted in the Continuing Appropriations Act (Pub.L. No. 100–202, § 8093, 101 Stat. 1329–44, 1329–79 (1987); 40 U.S.C. § 490 (Supp. V 1987)); (b) is contrary to Washington State law applicable to municipal utilities; (c) contains latent ambiguities created by the Air Force in the relationship of the Change of Rates clause to the amended Disputes article; (d) is illusory because it is a mere promise to negotiate, after which performance is discretionary; and (e) is an invalid perpetuity because of its indefinite term coupled with the obligation of the Disputes article to continue performance.

■ Defendant's motion to dismiss asserts the court lacks subject matter jurisdiction (RCFC 12(b)(1)): (a) over Count Four of the amended complaint because the issue was not properly presented to the CO, and (b) to consider plaintiff's request for declaratory relief. The amended complaint seeks relief founded on an express contract with the Government. The com-

plaint is not frivolous. Contracts made by government agencies traditionally have been within the general Tucker Act jurisdiction of the Court of Claims and this court. *See United States v. Mitchell*, 463 U.S. 206, 215, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967).

■ For purposes of dismissal on the pleadings under RCFC 12(b)(1), Count Four of the amended complaint states a claim within the subject matter jurisdiction of this court. 28 U.S.C. § 1491(a)(1); 41 U.S.C. § 609(a)(1); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Mindes v. Seaman*, 453 F.2d 197, 198 (5th Cir.1971); *Bray v. United States*, 785 F.2d 989, 992 (Fed.Cir.1986); *Merck & Co. v. United States*, 24 Cl.Ct. 73, 77–79 (1991). Accordingly, defendant's motion to dismiss Count Four under RCFC 12(b)(1) must be denied.

■ Inasmuch as the motion papers include materials outside the pleadings, defendant's motion to dismiss Count Four is converted to a motion for summary judgment. RCFC 12(b)(4). RCFC 56 mandates summary judgment if there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(c). The movant has the burden of demonstrating that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant can meet this burden by establishing that there is an absence of evidence on an essential element of the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Cross motions require the court to "evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

Both parties have conducted extended discovery, and both parties agree on the material facts of this case. Objections to the opponents findings of uncontroverted fact raise questions of contract and statutory interpretation—questions of law. Disposition of all counts in the complaint by summary judgment procedures is appropriate.

Procurement of utility services for federal installations involves a specialized field of federal procurement law that has developed to take into account the unique and sensitive problems that arise in contracts negotiated by federal representatives with representatives of state and local regulatory bodies. This specialized field, when the subject contract was made in 1972, embodied mature concepts of federal procurement policy and applicable contractual relationships.

■ Procurement of utility services for federal installations is accomplished through contractual agreements that are based on statutory and regulatory law. Federal law and not state law controls the interpretation of contracts between the United States and local governments that derive their authority from a state. *United States v. Allegheny*, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

■ Federal statutes provide a comprehensive policy governing procurements (10 U.S.C. §§ 2301–31 (1988)) and the regulations promulgated to carry out the statutory provisions are numerous, and comprehensive. Procurement regulations have the force and effect of law. *Pub. Utils. Comm'n v. United States*, 355 U.S. 534, 542, 78 S.Ct. 446, 452, 2 L.Ed.2d 470 (1958); *Santa Fe Engineers, Inc. v. United States*, 801 F.2d 379, 381 (Fed.Cir.1986); *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 673 F.2d 352, 355 (1982).

In 1972, the regulation applicable to procurements of electricity was Armed Services Procurement Regulation Supplement No. 5 (ASPR Supp. 5) dated September 1968. This regulation prescribes uniform policy, procedures, and contract formats

applicable to procurements of electrical services from both public and private sources.

The regulation recognizes that utility services may be provided by quasi-public service corporations, private concerns, municipalities, associations, or cooperatives that generally operate in a franchised territory without competition. A supplier frequently may be in a "sole source" position. The regulations note that under common law, public utilities must render service at reasonable rates and without unjust discrimination, and that their operations, management, rates, and profits are usually regulated by federal, state, or local regulatory bodies. ASPR Supp. 5, § S5–102.

Where a utility supplier is regulated by federal, state, and local regulatory bodies, ASPR Supp. 5, as to those matters over which the appropriate regulatory body has taken jurisdiction, declares that the policy of the Department of Defense, is to comply with the current regulations, practices, and decisions of that body concerning administrative matters, including rates, when subject to judicial appeal through the normal channels. This deference to regulatory body decisions is a matter of comity rather than law. The regulation provides, however, that this policy does not extend to those agencies which are regulating utilities owned or operated by the same Governmental entity which has established the regulatory body. § S5–103.2.

ASPR Supp. 5 authorizes indefinite term contracts. Such a contract is defined as one terminable "by the Government upon proper notice." § S5–106.1. An indefinite term utility contract ordinarily is drawn to continue until further notice. In the alternative, the contract "shall reserve to the Government the right to terminate on 30 days' notice." If a termination notice in excess of 30 days is needed to obtain a more favorable rate or more advantageous conditions of service, or for other valid reasons, a longer notice period may be allowed. § S5–106.2. Where it is in the Government's interest, a supplier may be given the right to terminate, provided specific advance approval is obtained from Headquarters, Air Force Logistics Command. § S5–106.2(b).

ASPR Supp. 5 requires a determination, before a rate increase can be made applicable under a contract, that the increase is "reasonable, justified and not unjustly discriminatory." § S5–110. Where the utility company is regulated by a public regulatory body, a rate increase (or decrease) embodied in a published rate schedule issued by the utility supplier may be incorporated into the contract by a change order. Where the utility supplier is not regulated or where the rate is subject to negotiation pursuant to the Alternate B contract format, the contract must be modified by supplemental agreement. The Alternate B format is used when the supplier is owned or operated by the same Governmental agency which has established the regulatory body. § S5–203.2 II 3 note.

The standard clause (§ S5–203.2 II 3(b)) in the Alternate B, Change of Rates, format is:

At the request of either party to this contract with reasonable cause, the rates set forth herein shall be renegotiated and the new rates shall become effective as mutually agreed—provided that any rates so negotiated shall not be in excess of rates to any other customer of the Contractor under similar conditions of services.

An additional provision for use with Alternate B is authorized. This addition is:

No increase shall be requested in the contract rate unless the Contractor has placed into effect a general rate increase to all of his customers under similar conditions of service. If the Contractor has placed into effect a general rate decrease, a corresponding decrease in the contract rate shall be made.

■ From the foregoing, it is clear that the November 20, 1972, contract to provide electrical services to McChord AFB, complied with statutory law and regulations applicable to such utility contracts. The contract was lawful and was mutually acceptable at the time it was entered.

Mod 3, effective January 1, 1980, deleted the January 1958 version of the Disputes

article and incorporated a new Disputes article that gave effect to new statutory requirements imposed in the CDA. Mod 3 was executed by authorized representatives of the parties and such action was approved by resolutions of the City's Public Utility Board and the City Council. Mod 3 was a bilateral amendment to the 1972 contract that gave effect to all statutory law and regulatory requirements applicable to contracts for electrical services. The amendment was lawful, binding, and mutually acceptable when made.

 Plaintiff's claims principally involve the Change of Rates, the amended Disputes and the Term provisions that were in the contract, as amended. Interpretation of the meaning of contract provisions is a matter of law. Contracts are to be interpreted as a whole, unless no other interpretation is possible, in order that specific clauses will not be construed to be in conflict with other contractual provisions. *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343 *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); *Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 974 (1965). When interpreting a contract, a court should impart a reasonable meaning to all terms, so that no term is rendered meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985). The Court of Claims has stated:

> an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result.

*Arizona by Arizona Dep't of Transp. v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978). Matters outside the contract should not be considered, unless the language of the contract is ambiguous. *See Sylvania Elec. Products, Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972); *accord David Nassif Associates v. United States*, 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977). In this case the plain language of the contract as a whole establishes that the Term, the Change of Rates, and the

Disputes provisions are not ambiguous, conflicting or illusory, and taken together, they do not create an invalid perpetuity.

 Plaintiff argues a latent ambiguity exists by virtue of the interaction between the Change of Rates and the amended Disputes provisions. In previous contracts, the Government, under the Change of Rates clause, had agreed to pay new rates "from and after the date when such rates are made effective" in a duly enacted City ordinance. In the 1972 contract, however, under the new Change of Rates clause, new rates did not become effective until the contract rates were renegotiated and mutually agreed. The 1972 contract, moreover, contained a Disputes article that did not apply to "disputes which are subject to the jurisdiction of a Federal, state, or other appropriate regulatory body." The new Disputes article made operative in 1980 by Mod 3 did not contain this limitation. The new Disputes article clearly does not contain any exception for disputes over rates subject to the jurisdiction of a regulatory body. The new disputes procedure unambiguously applies to all disputes related to the contract.

Plaintiff emphasizes that since at least 1945 defendant has accepted and paid rate changes established by the City by ordinances. Until 1972, the contract Change of Rates clause specifically so provided, and until 1980, rate changes by City Ordinance were excepted from the disputes procedures. Further, between 1973 and 1977, defendant accepted all rate changes as established by ordinance. This lengthy course of dealing, plaintiff asserts, demonstrates the amended contract is ambiguous.

 Plaintiff fails to recognize, and give effect to, the contractual relationship that exists. The amendment in the 1972 Change of Rates provision was the subject of specific negotiations between the parties. Although the record is sparse as to negotiation sessions relative to the new Disputes article in 1980, Mod 3 was an amendment to the contract that was bilaterally agreed and duly approved. In both instances new contractual relationships were established by mutual agreement, the

terms of which are clear. An extended course of conduct is not sufficient to create an ambiguity in contract terms that were changed by mutual agreement and which are clear on their face.

When the rate increase dispute between the parties arose in 1988, the contract, by the agreement of the parties, was subject to the CDA. Thus, the dispute resolution mechanism for the City to resolve its monetary claim relating to the contract was the Disputes article and the CDA. *See Essex Electro Engineers, Inc. v. United States,* 702 F.2d 998 (Fed.Cir.1983) (For contracts awarded prior to enactment of CDA, contractors must specifically elect to have their contract disputes covered by the CDA).

Contrary to plaintiff's contention, the Change of Rates clause cannot be construed in a manner inconsistent with the Disputes article of the contract. The contract requires the parties to renegotiate the rates. *See Hoel–Steffen Constr. Co. v. United States,* 231 Ct.Cl. 128, 684 F.2d 843 (1982). Reading the contract, as a whole, it is clear that the parties intended to renegotiate new rates pursuant to the Change of Rates provision. In the event of a failure to agree on new rates, the City may submit a claim to the CO pursuant to the Disputes article and receive a CO's final decision that can then be appealed in accordance with the CDA.

 Plaintiff contends that if rate changes under the Change of Rates clause are made subject to the disputes procedures, the contract is rendered illusory, on the ground that a promise to agree to do something that requires a future meeting of the minds is an illusory contract. Plaintiff cites *e.g., Interchange Associates v. Interchange, Inc.,* 16 Wash.App. 359, 557 P.2d 357, 358 (1976) (Members of a corporate board of directors could resign at anytime, so that their promises to manage the corporation were illusory and not supported by consideration); *Sandeman v. Sayres,* 50 Wash.2d 539, 314 P.2d 428, 429 (1957) (Employee's contract for future bonus was subject to being decided in the future, so that an indefinite unenforceable contract was created).

These cases are not apposite. In this case, the parties by an amended contract established their obligations by mutual agreement. The Change of Rates clause and the Disputes article acknowledge that times may change and the fixed terms of the contract might require adjustment. The recognition of such contingencies, as well as contract clauses designed to address future events, are well known and respectable concepts. *See North Bonneville v. United States,* 5 Cl.Ct. 312, 319–23 (1984). None of the contracts discussed in the cases cited by plaintiff contained a disputes provision similar to that in Mod 3. The 1972 contract is supported by mutuality of obligation, it is not illusory.

The amended contract provides the parties with a mechanism to resolve rate disputes. ASPR Supp. 5 requires a CO to negotiate new rates in good faith. Section S5–110 establishes a standard against which the CO is required to act in reviewing rate changes proposed by the plaintiff. This standard creates a duty upon the CO to negotiate rate changes proposed by the City, and incorporate those changes into the contract by modification when the negotiated rates are reasonable, justified, not unduly discriminatory, and otherwise in accordance with the contract.

 The Disputes article in the amended contract requires plaintiff to continue performance pending final resolution of the dispute. The CO, in the October 5, 1990, final decision, invoked this requirement to deny plaintiff's request to terminate electric service during pendency of the dispute over rates. Contrary to plaintiff's argument, the disputes procedure does not thus create an invalid perpetuity. Both plaintiff's May 11, 1990, claim and its September 24, 1990, claim to the CO involved a rate change dispute. Neither raised the dispute that, on the facts, the CO was required to render a final decision that the contract had been terminated in accordance with its terms. Plaintiff's execution of Mod 16 on July 23, 1990, relative to new rates that became effective on April 2,

1990, establishes that the parties considered the contract to continue to be viable. Plaintiff did not lay the foundation required to set in motion a dispute on which the issue of a right to terminate service would be ripe for final decision.

Plaintiff contends the contract as amended is contrary to federal law applicable to electricity service contracts and to Washington State law governing provision of electric utility service. Section 8093 of the Continuing Appropriations Act of 1987 states in part that:

> None of the funds appropriated or made available by this or any other Act with respect to any fiscal year may be used by any Department, agency, or instrumentality of the United States to purchase electricity *in a manner inconsistent with State law* governing the provision of electric utility service, including State utility commission rulings and electric utility franchises or service territories established pursuant to State statute, state regulation, or State-approved territorial agreements. (Emphasis added).

■ In 1919, Pierce County, Washington, conveyed land to the Secretary of War. Pursuant to the Revised Code of Washington section 37.16.180, "the consent of the ... State of Washington [was] hereby given to the exercise by the congress of the United States of exclusive legislation in all cases, whatsoever, over such tracts or parcels of land so conveyed to it." Part of this land, presently known as McChord AFB, was transferred to the Secretary of the Air Force on June 15, 1950. McChord AFB is a federal enclave, accordingly, with exclusive federal legislative authority.

■ A federal enclave generally can not be regulated "because of the constitutional grant of 'exclusive legislation' respecting lands purchased by the United States with the consent of the State, even though there was no conflicting federal Regulation." *Paul v. United States,* 371 U.S. 245, 263–64, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963) (quoting *Pacific Coast Dairy v. Dep't of Agriculture,* 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761 (1943)). An authorization of state regulation is found only when there is a clear congressional mandate and clear congressional action that makes state regulation clear and unambiguous. *Hancock v. Train,* 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976). There is no such clear and specific language in section 8093.

In its consideration of section 8093, the Eighth Circuit, in *West River Elec. Ass'n v. Black Hills Power & Light Co.,* 918 F.2d 713, 719–20 (8th Cir.1990) stated:

> Absent such amendment, we can only conclude that in enacting section 8093, Congress sought to submit federal installations and other federal agencies to state regulation in the procurement of utility service, while refraining from subjecting a federal enclave, a constitutionally-created entity, to such state control.

■ Wholly apart from the Eighth Circuit decision, which is persuasive, even if the continuing appropriation restriction applies to this contract, in this case, plaintiff has failed to demonstrate how the contract violates any applicable laws of the State of Washington governing the purchase of electric utility service.

The contract is a valid, binding obligation that would be enforced in plaintiff's own state courts. *Scott Paper Co. v. Anacortes,* 90 Wash.2d 19, 578 P.2d 1292 (1978). Defendant does not contest that rates set by the City Council are products of a legislative act. But the operation of the utility is activity within the City's proprietary capacity. The City was authorized by state law to enter the 1972 contract and agree to its terms. The City is obligated to abide by its contract obligations to renegotiate the rates or dispute its claim in accordance with the Disputes article. In accepting the 1972 contract, the City did not act *ultra vires.*

Plaintiff has not demonstrated how its obligations under the contract conflict with any statutory or other limitation on its authority. *See Chemical Bank v. Washington Public Power Supply System,* 99 Wash.2d 772, 666 P.2d 329 (1983) (public utilities violated state statutory provisions in construction of nuclear power plant).

Plaintiff has not shown that its contract, in whole, or in part, conflicts with Washington State law. A rate renegotiation clause has been approved by the Washington Supreme Court. *Scott Paper Co.*, 578 P.2d 1292. Plaintiff's contract obligations do not conflict with any applicable state law and are enforceable.

■ Plaintiff alleges that the Prompt Payment Act (PPA), 31 U.S.C. §§ 3901 *et seq.*, applies to the "undisputed" amount which defendant admitted it owed in the CO's June 30, 1990, final decision. Plaintiff acknowledges that only a portion of each invoice is "undisputed," but states that the undisputed portion is easily identifiable.

The PPA requires the Government to pay an interest penalty to a business concern when the Government fails to pay for a completed service by the required payment date. The PPA does "not require an interest penalty on a payment that is not made because of a dispute ... over the amount of payment." 31 U.S.C. § 3907(c). Pursuant to federal regulations prescribed by the Office of Management and Budget (OMB), "[i]nterest payment will apply to payments made under contracts issued on or after October 1, 1982." 47 Fed.Reg. 37,321, 37,324 (1982); *see* 31 U.S.C. § 3903(a).

The PPA does not apply here because the contract at issue was awarded in November 1972 and has never been modified to incorporate the PPA. Plaintiff contends that OMB's October 1, 1982, date does not apply to this contract, because new contracts were created by the modifications. Plaintiff suggests that a new contract existed on each of the modification dates, some of which were subsequent to October 1, 1982. OMB Circular A–125 does not provide for such exception.

■ A contract modification does not necessarily create a new contract. Here the parties' decisions in Mods 1–13 and Mod 16, to modify the contract were acts of administration provided for in the contract. The modifications primarily reflected changes in the rates charged to the defendant. The contract anticipated such

changes would be made by supplemental amendments. The Change of Rates provision was only incidental to the main purpose of supplying electric utility service for an indefinite term. "Alteration of some details of a contract, while leaving undisturbed its general purpose, constitutes a mere modification of the original contract, and the latter remains in force as modified." *Stinnett v. Damson Oil Corp.*, 648 F.2d 576, 582 (9th Cir.1981); 58 Am.Jur.2d *Novation* § 26 (1989). The modifications did not create a new contract because the general purpose remained intact. The November 1972 date mandates the conclusion that the PPA is inapplicable to this case.

Plaintiff also argues that it has an implied-in-fact contract that arose in April 1988 when defendant "breached" its contract, but continued to receive electric service. Defendant has not breached the 1972 contract as amended, and the issue of whether an implied-in-fact contract exists never arises.

———

On the basis of the foregoing, defendant's motion to dismiss under RCFC 12(b) is denied; defendant's motion for summary judgment on all counts in the complaint is allowed. Plaintiff's motion for summary judgment is denied. The Clerk is directed to dismiss the complaint. No costs.