PLAGER, Circuit Judge.
 

 The Court of Federal Claims granted the Government summary judgment on Plaintiff Richmond, Fredericksburg & Potomac Railroad Company’s (“RF & P’s”) breach of contract and takings claims.
 
 Richmond, Fred-ericksburg and Potomac Railroad Co. v. United States,
 
 27 Fed.Cl. 275 (1992). The parcel of land involved was conveyed in 1938 to RF & P by the Government. RF & P asserted before the trial eourt that changed conditions surrounding the land nullified the use restrictions in the conveyancing documents, and therefore the Government’s continued representation to RF & P and third parties that such restrictions continue to apply had the effect of breaching the conveyancing “contract,” and constituted a taking in violation of the Fifth Amendment. The trial court disagreed, finding that the plain language of the conveyancing documents imposed perpetual use restrictions on the land, and that, even if the restrictions no longer applied, the Government’s assertions to the contrary did not so interfere with RF & P’s possessory interest as to effect a taking. We agree with the trial court that the use restrictions imposed on the land at issue continue to apply, and conclude that RF & P is not entitled to the relief it seeks. Accordingly, we affirm.
 

 I. BACKGROUND
 

 An extensive exposition of the facts is set out in the opinion of the Court of Federal Claims. We set forth here only those facts needed to understand the issues on appeal.
 

 RF & P was chartered in 1834 by the General Assembly of the Commonwealth of Virginia. RF & P constructed Potomac Yard in Arlington County, Virginia and, since the early 1900’s, has operated the yard as a joint facility that has been used by RF & P and other railroads. Potomac Yard provided a central location for railroad interchange and provided the tenant railroad companies with essential services.
 

 In 1928, the Government undertook construction of the Mount Vernon Memorial Highway (“the Highway”) along the western
 
 *650
 
 shore of the Potomac River. In 1930 and 1932, RF & P conveyed real property on the western shore of the Potomac River to the Government, including 198.6 acres in the cove of Four Mile Run, for construction of the Highway and other purposes of the Government. The Government constructed a fill or causeway in the cove of Four Mile Run for the Highway in 1930 on the property deeded, by quitclaim deed, to the Government by RF &P.
 

 In January 1932 the Government brought an action to quiet title on certain land known as Roaches Run or Shallow Bay. The Government named RF & P as a defendant, as the Government claimed title to nearly 24 acres RF & P alleged to be its own. After filing its quiet-title action, the Government, through the National Capital Park and Planning Commission (“the Commission”), began settlement negotiations with RF & P. The Government sought a compromise settlement involving certain tracts of land which included Area 3, a tract of land composed of the western-most portion of the cove of Four Mile run. The Commission’s representatives stated that the Government’s interests in the quiet title action were to extinguish a recent Virginia land grant to some private parties and to protect the scenic views from the planned Highway. RF & P’s objective was to clear its title to areas needed for the expansion of Potomac Yard and other railroad-related facilities.
 

 An Act of June 4, 1934, ch. 375, 48 Stat. 836, authorized the Secretary of the Interi- or, on behalf of the Government, to make and accept conveyances of lands in dispute in, under, and adjacent to the Potomac River. Under this authority, on February 12, 1938, the Government entered into an Indenture with RF & P. The Indenture, recorded among the land records of both the District of Columbia and Arlington County, Virginia, was a written “compromise agreement” made “in order to facilitate the settlement of ... claims and controversies and the establishment of the title of the United States of America in and to lands in, under and adjacent to [the] Potomac River by making equitable adjustments of such claims and controversies between the United States of America ... and [RF & P]____”
 

 The 1938 Indenture stated that “for and in consideration of the premises and for the purpose of carrying into effect the provisions of the aforesaid compromise agreement ... and in further consideration of the mutual conveyances, quitclaims, covenants and agreements made reciprocally by and between [RF
 
 &
 
 P] and [the Government],” RF
 
 & P
 
 and the Government “respectively grant and convey each to the other” stated “property, estates, rights, interests, easements, servitudes, privileges^] and appurtenances” and “agree one with the other in manner and form and to the purpose and effect” of the Indenture.
 

 The 1938 Indenture provides that the Government “remise, release and forever quitclaim unto [RF & P], its successors and assigns forever, subject to the restrictions, covenants and conditions ... set forth, all right, title, interest and estate, whatsoever, both at law and in equity, of [the Government] in ... marsh land, made land and land under water ... described under the designation of Area
 
 3, tobe used by [RF & PJ, its successors and assigns, solely for the construction, maintenance and operation of its main line railroad tracks and ways and a freight yard in connection therewith.”
 
 (Emphasis added.)
 

 The 1938 Indenture further provides that, “in pursuance of the compromise agreement and for the considerations ... recited,” RF & P “covenant for itself, its successors and assigns, with the United States of America, ... its successors and assigns, that it
 
 will not use said area or trad ... quitclaimed to it under the designation of Area 3 for any other purpose than the construction, maintenance and operation by it of its main line railroad tracks and ways and a freight yard in connection therewith.”
 
 (Emphasis added.) Since February of 1938, RF & P has used the portions of Area 3 to which it has retained title solely for the purposes described in the Indenture, that is, for uses in connection with its mainline railroad tracks and ways and as a freight yard.
 

 Due to a decrease in railroad need, Potomac Yard by 1991 handled only 20 percent of
 
 *651
 
 the number of freight ears that it handled at its peak. RF & P now wants to develop the land for other uses. RF & P claims that it is no longer bound by the restrictive covenant in the 1938 Indenture because conditions in and around Area 3 have changed substantially. RF & P alleges several grounds for the requested relief.
 

 First, the size of Area 3 has been reduced through condemnations by the surrounding state governments. For example, in 1975 and 1977, the Washington Metropolitan Area Transit Authority (“WMATA”) condemned over 2 acres of Area 3 for construction of a Metro rail line. The line, which is elevated in part, runs between the remainder of Area 3 owned by RF & P and the Highway, which has become the George Washington Memorial Parkway. In 1987 the Commonwealth of Virginia condemned a portion of Area 3 for the widening and improvement of Route 1, also known as the Jefferson Davis Highway.
 

 Second, the original Highway, now the George Washington Memorial Parkway, is no longer separated by a buffer area from property used by RF & P for railroad purposes, but is instead located on the previously contemplated buffer area and a portion of Area 3 itself. Third, the 1938 right-of-way of the Highway across the cove of Four Mile Run is now part of National Airport, and part of this right-of-way and of a tract quitclaimed to the Government in 1938 as a buffer between the Highway and the railroad is now an airport parking lot. Fourth, substantial mixed-use development has occurred near Area 3, including the development called Crystal City in Arlington County, Virginia.
 

 The Government has acknowledged these developments. In a letter dated July 23, 1980, a Deputy Regional Director of the Park Service wrote that the “adjacent development of National Airport and Crystal City have severely impacted and detracted from the scenic quality of the parkway as it was originally designed____” In a 1989 draft environmental study of the area, the Park Service noted that, although the designers of the Highway had anticipated some land use changes, “they did not anticipate either the dramatic level of change or significant additional changes,” particularly in the Gravelly Point-Airport Zone, where “dramatic changes have occurred.” In the final environmental study, dated February 1991, the Park Service repeated this language and, responding to comments on the draft, added: “One has only to look at the photographs of the parkway taken in the 1960’s to understand the extensive development that has taken place adjacent to the parkway at Crystal City and National Airport. Today the parkway snakes through a narrow alley of buildings that dominate the views from the parkway____”
 

 Nevertheless, the Government has asserted consistently that the Government continues to value the presence of the scenic views from the Parkway, and that the 1938 Indenture restrictions on the use of Area 3 continue to apply. At an April 15,1988 meeting, a ■ Park Service official informed RF & P and Arlington County representatives that the 1938 Indenture “totally restricts development” on Area 3. The Park Service stated, however, that if RF & P would provide a 500-foot historical setback from the Parkway, it would allow RF & P partially to develop the tract in accordance with the desires of Arlington County. On July 20,1989, the Park Service requested the National Park Service Planning Commission to add three parcels of land held by RF & P, including Area 3, to the Parkway. The Park Service’s request described two of these areas as having been “indentured to the Department of Interior since 1938” and further described the indentures as providing the Park Service with “easements over the properties, with restrictions on building heights and types of uses permitted.”
 

 During this time period, officials of the Park Service made public statements about the effect of the 1938 Indenture on Area 3’s use. On August 8, 1989, Park Service officials were reported in a local newspaper as stating that the 1938 Indenture “means they have a say — and even veto power” over a development proposed by RF & P for Area 3. According to that article, Park Service officials also said that “easements” embodied in the 1938 Indenture “mean only railroad uses are allowed” on Area 3. In the same article, Jack Benjamin, Deputy Associate Regional
 
 *652
 
 Director of the Park Service for the National Capital Region, was quoted as saying that the Park Service’s goal in maintaining the “easements” on Area 3 was to protect the scenic value of the Parkway: “Our interest, back in 1938, as it is today, is to protect the scenic and landscape values of the parkway.”
 

 In November 1989 federal officials were reported as stating that the Park Service had “an ace in the hole” to prevent RF & P’s development of Potomac Greens, a major project proposed for Alexandria, Virginia: “36 acres within nearby Potomac Yard in Arlington that the RF & P owns and wants to develop but that the park service [sic] says can [be] used only for railroad purposes under a 1938 agreement.” According to federal officials, the Park Service “might give RF & P the right to build on the 36 acres if the railroad gives up its right to build a parkway interchange for Potomac Greens.”
 

 On April 2,1990, Robert Stanton, the Park Service’s Regional Director for the National Capital Region, sent a letter to the General Services Administration (“GSA”) regarding a proposal to develop a portion of Area 3 as a site for an office complex for the Navy Department. Copies of the letter were circulated to a number of officials of state and local governments. Mr. Stanton wrote,
 
 inter alia,
 
 that the National Park Service owns restrictive easements over 36 acres of land, now occupied by RF & P, directly north of Four Mile Run between the George Washington Memorial Parkway and Route 1.
 

 On August 10, 1990, RF & P filed a quiet title action in the United States District Court for the Eastern District of Virginia,
 
 Richmond, F. & P. R.R. v. United States,
 
 No. 90-1082-A (E.D.Va., filed Aug. 10,1990), seeking declaratory relief pursuant to 28 U.S.C. § 2409a (1988). RF & P requested extinguishment of the restrictive covenant or, in the alternative, a declaration that the covenant only required partial use of Area 3 for railroad purposes. On November 2, 1990, in an unpublished opinion, the District Court dismissed the case as time barred. The Fourth Circuit affirmed, and the Supreme Court denied RF & P’s petition for writ of certiorari.
 
 Richmond, F. & P. R.R. v. United States,
 
 945 F.2d 765, 770 (4th Cir.1991),
 
 cert denied,
 
 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388, (1992).
 

 On the same date that it filed its District Court case, RF & P filed suit in the United States Court of Federal Claims, alleging a breach of the 1938 Indenture and requesting a declaratory judgment that RF & P has the legal and equitable right to develop and use Area 3 for purposes other than its mainline railroad tracks and ways and a freight yard, without regard to the restriction in the covenant regarding Area 3. RF & P subsequently amended its complaint to seek money damages rather than declaratory relief, asserting a breach of contract and a taking by the United States.
 

 RF & P contends that the covenant regarding Area 3 did not run to the benefit of the Highway. Plaintiff claims that the covenant was for the benefit of “the adjacent lands owned by the [Government] and the lands by this indenture conveyed or quit-claimed to [the Government] by [RF & P],” as stated in the Indenture. The United States maintains that the Highway is within the lands intended to be benefited by the Area 3 restrictive covenant. The Government also asserts that the benefit of the covenant still runs with the Mount Vernon Memorial Highway and includes a portion of the George Washington Memorial Parkway as it passes through the indentured areas.
 

 The Court of Federal Claims denied the Government’s motion to dismiss for lack of jurisdiction under 28 U.S.C. § 1500. The Court held that the restrictive covenant in the 1938 Indenture unambiguously denied RF & P its desired property use, and further held that asserting the continued application of the covenant did not effect a taking. RF & P appeals, asking this Court to review, first, the lower Court’s construction of the property-transfer provisions and, second, whether the Government’s actions constitute a taking in violation of the Fifth Amendment of the Federal Constitution.
 

 II. DISCUSSION
 

 A.
 
 Standard of Review
 

 We review the trial court’s judgment under the traditional standards: conclusions of law anew, factual findings for clear error.
 

 
 *653
 
 B. Jurisdiction
 
 [1]
 

 We first address the Government’s argument that, in light of the Supreme Court’s decision in
 
 Keene v. United States,
 
 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993),
 
 affg, UNR Indus., Inc. v. United States,
 
 962 F.2d 1013 (Fed.Cir.1992)
 
 (in banc),
 
 the Court of Federal Claims lacked jurisdiction over RF & P’s claims under 28 U.S.C. § 1500. “Jurisdiction is a pure question of law which we review
 
 de novo.” La-Barge Products, Inc. v. West,
 
 46 F.3d 1547, 1550 (Fed.Cir.1995). Section 1500 precludes the United States Court of Federal Claims from taking jurisdiction of a claim against the United States if plaintiff files the claim at a time when the same claim is pending in another court. In
 
 Keene,
 
 the Supreme Court held that the Section 1500 bar is determined on the date the complaint is filed. On the date RF & P filed its suit in the Court of Federal Claims, it also filed with the District Court.
 

 Although RF & P argued initially that the Court of Federal Claims had jurisdiction over its suit, on appeal RF & P has reversed its stance and urges us to vacate the trial court’s unfavorable judgment for lack of jurisdiction. On the basis of the suits initially filed, RF & P and the Government may be correct. The suits initially filed on the same date in the Eastern District of Virginia and in the Court of Federal Claims arose from the same operative facts, and asked both courts for essentially the same relief, a declaration that RF & P had the right to develop the property free of any restrictive covenant contained in the 1938 agreement. Since the district court suit arguably was pending at the time the Court of Federal Claims suit was filed, the latter would be without jurisdiction to entertain the suit.
 
 [2]
 

 However, while the decision of the district court, dismissing RF & P’s suit for untimeliness, was on appeal in the Fourth Circuit, RF & P filed an amended complaint in the Court of Federal Claims. In the amended complaint, RF & P now sought money damages for breach of contract and a taking under the Fifth Amendment. The trial judge correctly denied the Government’s motion to dismiss the amended complaint for lack of jurisdiction under Section 1500. “For the Court of Federal Claims to be precluded from hearing a claim under § 1500, the claim pending in another court must arise from the same operative facts, and must seek the same relief.”
 
 Loveladies Harbor, Inc. v. United States,
 
 27 F.3d 1545, 1551 (Fed.Cir. 1994) (in banc). Because the district court suit and the suit in the Court of Federal Claims under the amended complaint did not seek the same relief, 28 U.S.C. § 1500 does not apply.
 
 Dico, Inc. v. United States,
 
 48 F.3d 1199 (Fed.Cir.1995).
 

 C.
 
 The Property at Issue
 

 RF & P claims that the Court of Federal Claims erred in not finding a breach of the 1938 Indenture. In analyzing rights and remedies due a property owner, we must first determine the exact nature of the properly interests at issue.
 

 When land is conveyed in fee simple subject to an agreement between two parties restricting the property’s use, the conveyance could create in the transferee a fee simple determinable, a fee simple on condition subsequent, or a fee simple subject to a restrictive covenant, depending on the word
 
 *654
 
 ing of the conveyance. In this case, the conveying documents do not contain language suggestive of either a fee simple determinable or a fee simple on condition subsequent.
 
 See Board of County Supervisors of Prince William County v. United States,
 
 48 F.3d 520 (Fed.Cir.1995).
 
 See also, Edward H. Rabin and Roberta Rosenthal Kwall, Fundamentals of Modem Property Law, 3d Ed.
 
 (1992). In the 1938 Indenture, the Government “remise[d], release[d] and forever quitclaim[ed] unto [RF & P], its successors and assigns forever, ... subject to the restrictions, covenants and conditions hereinafter set forth, all right, title, interest and estate whatsoever, both at law and in equity.” [A58] The “restrictions, covenants and conditions” set forth provide that RF & P will use the land “solely for the construction, maintenance and operation of its main line railroad tracks and ways and a freight yard in connection therewith.” [A59] It is clear that both the parties’ intent and the purpose of these provisions was to convey a fee simple estate to RF & P, with a limitation on the uses to which the property could be put, and by which RF & P agreed and promised to abide. The promises in the indenture restrict RF & P’s use and enjoyment of the land, creating a restrictive covenant enforceable by the Government.
 

 D.
 
 Breach of Contract
 

 RF & P argues that the Government breached the 1938 Indenture by asserting its right presently to enforce use restrictions contained in that Indenture. RF & P’s premise is that the Indenture does not impose perpetual use restrictions; no duration to the restrictions is mentioned in the Indenture. RF & P further argues that the Court of Federal Claims should have construed the restrictions in light of extrinsic drafting history evidence, which shows that perpetual restrictions were not intended. In this regard, RF & P contends that federal contract law governs, and requires the use of extrinsic evidence. Therefore, according to RF & P, the Government is implicitly bound under the Indenture to abide by the terms of the Indenture which, if properly construed, include representing restrictions accurately to third parties. To the extent the Government did not do so, it breached the Indenture, causing RF & P damages by preventing RF & P’s development scheme.
 

 1.
 
 Choice of Law.
 
 There is an initial question: is this a matter involving “uniquely federal interests” that is “so committed by the Constitution and laws of the United States to federal control that state law is preempted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts— so-called ‘federal common law”’?
 
 Boyle v. United Technologies Corp.,
 
 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988). RF & P argues that it is, and that this case should be controlled by Federal contract law and, therefore, extrinsic evidence must be permitted in interpreting the contract. Citing
 
 Keydata Corp. v. United States,
 
 504 F.2d 1115, 205 Ct.Cl. 467 (1974), RF & P asserts that the meaning of the 1938 Indenture is to be gleaned from “a uniform federal [contract] law.” 504 F.2d at 1123.
 

 RF & P is correct that the Indenture’s interpretation is governed by federal law. Although the general rule is that, when dealing with real property, state law “controls acquisition, transmission, and transfer of property,”
 
 Davies Warehouse Co. v. Bowles,
 
 321 U.S. 144, 155, 64 S.Ct. 474, 480-81, 88 L.Ed. 635 (1944)), “the right of the United States to seek legal redress for duly authorized proprietary transactions is a federal right, so that the courts of the United States may formulate a rule of decision.”
 
 United States v. Little Lake Misere Land Co., Inc.,
 
 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973) (Internal quotes omitted).
 

 However, that “uniquely federal interests” are involved “merely establishes a necessary, not a sufficient, condition for the displacement of state law. Displacement will occur only where ... a significant conflict exists between an identifiable federal policy or interest and the operation of state law.”
 
 [3]
 
 
 *655
 

 Boyle,
 
 487 U.S. at 507, 108 S.Ct. at 2516 (Internal quotes omitted).
 

 In
 
 Little Lake Misere,
 
 the Supreme Court rejected state law as the governing law in determining the title to real property claimed by the Federal Government, because the local rule of decision in that case, a Louisiana statute, purported expressly to modify rights under deeds to the United States in a manner adverse to the Government’s interests. The statute conflicted with federal legislation, frustrating a federal regulatory scheme and creating uncertainty in land transactions. However, that is not the situation here.
 

 In this case, local Virginia law governing property transactions has not been shown hostile to federal interests, and does not frustrate any federal regulatory scheme. Rather, the Virginia rules of decision are neutral rules, applicable to all land transfers, regardless of whether or not the federal government is involved. Furthermore, there is no overriding federal regulatory scheme warranting creation of federal common law. The general rule announced by the Supreme Court in
 
 Davies Warehouse,
 
 321 U.S. at 155, 64 S.Ct. at 480-81, applies, and state property law functions as the federal rule of decision governing this issue. Because the land at issue is located in Virginia, we apply Virginia property law to interpret the Indenture.
 

 2.
 
 Duration of the Restrictive Covenant.
 
 RF & P argues that, if properly construed, the covenant does not give the Government the interest the Government asserts. And under those circumstances, assuming that both parties to a contract have a duty to not misrepresent their contractual benefits and burdens, the government has somehow breached the “contract” by asserting rights it does not possess.
 

 It is not necessary to test plaintiffs assumption. Furthermore, it is not necessary to address plaintiffs tortured logic turning breach of an equitable duty into a breach of contract. Even giving RF & P the benefit of the doubt on these two issues, the issue is disposed of because the Indenture’s proper construction supports the Government’s position.
 

 Virginia law construes deeds conveying interests in real property according to a “plain meaning” rule. Once a court determines that a “deed [is] clear and unambiguous, it [is] required to focus upon the language of the deed
 
 and from, that source alone,
 
 construe its meaning.”
 
 Trailsend Land Co. v. Virginia Holding Carp.,
 
 228 Va. 319, 326, 321 S.E.2d 667, 670-71 (1984) (emphasis supplied).
 
 See also Foods First, Inc. v. Gables Assoc.,
 
 244 Va. 180, 182, 418 S.E.2d 888, 889 (1992);
 
 Lerner v. Gudelsky Co.,
 
 230 Va. 124, 132, 334 S.E.2d 579, 584 (1979). The 1938 Indenture is crystal clear in its restrictions. It states that the Government “remise[d], release[d] and forever quitclaim[ed] unto [RF & P],
 
 its successors and, assigns forever, ...
 
 subject to the restrictions, covenants and conditions hereinafter set forth, all right, title, interest and estate whatsoever, both at law and in equity.” (Emphasis added.) [A58] The “restrictions, covenants and conditions” set forth provide that RF & P will use the land “solely for the construction, maintenance and operation of its main line railroad tracks and ways and a freight yard in connection therewith.” [A59] Under any rational construction of this Indenture, the restrictions on “[RF & P], its successors and assigns forever” must be understood to be of indefinite duration. Therefore, absent some other applicable doctrine truncating the covenant’s duration, such as changed conditions, discussed next, the restrictions maintain their validity, and the Government did no wrong in asserting its rights to enforce the covenant.
 

 E.
 
 Changed Conditions
 

 In Virginia, land-use restrictions may be terminated by an appropriate change of conditions.
 
 Booker v. Old Dominion Land Co.,
 
 188 Va. 143, 49 S.E.2d 314 (1948). Ordinarily, the issue would arise when the burdened party (here RF & P) was charged with breach of the covenant, and the benefited party (here the Government) sued for money
 
 *656
 
 damages or an injunction. The burdened party may then defend by asserting,
 
 inter alia,
 
 the equitable defense that changed conditions have rendered the restrictions null and void. In an appropriate ease, the burdened party may anticipate the benefitted parly’s suit by bringing an equitable action for quiet title or declaratory relief, alleging that the covenant is unenforceable due to the changed conditions.
 
 See generally 5 Powell, The Law of Real Property
 
 § 679[2] (1994). That is what RF & P did in its unsuccessful district court suit.
 

 In this case, RF & P, having failed in its equitable action, attempts to turn a shield into a sword, and alleges that the Government breached the covenant or, in the alternative, has taken RF & P’s property by asserting that the covenant is perpetual when, under a proper construction of the covenant in light of changed conditions, the restrictions no longer apply. In this way, RF & P has inverted the defense of changed conditions into a cause of action at law.
 

 The trial court held the changed-conditions doctrine inapplicable in this case on several grounds, including that it is an equitable doctrine available only to a defendant as a shield to prevent the benefitted party from enforcing the covenant. We need not address the question of whether the changed-conditions doctrine may be used as a sword at law as well as a shield in equity. Even assuming that RF & P properly invoked the doctrine, we hold that, consistent with Virginia law, circumstances have not changed sufficiently to nullify the covenant’s restrictions.
 

 “No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement.”
 
 Deitrick v. Leadbetter,
 
 175 Va. 170, 8 S.E.2d 276 (1940). Furthermore, these changes must render the restriction’s enforcement “inequitable and oppressive.”
 
 Ault v. Shipley,
 
 189 Va. 69, 52 S.E.2d 56, 59 (1949).
 

 As the Government necessarily acknowledged, conditions have changed in the area since 1938. However, the question is not whether conditions have changed; the question is whether conditions have changed enough to frustrate the purpose of the restrictions. RF & P argues that the purpose of the covenant was to permit the railroad use contemplated and desired by RF & P, while shielding it from view from the Mt. Vernon Memorial Highway. RF & P thus admits that at least one of the purposes of the restrictive covenant is to retain scenic views. RF & P argues, however, that because the Highway was never built, and the Parkway was constructed along a slightly rerouted path, the Government somehow lost its benefit under the Indenture. However, it cannot matter that the Highway, when completed, was not called the Mount Vernon Memorial Highway, or that the Highway was not built along the exact path originally planned by the Government. The Highway, now called the George Washington Memorial Parkway, was constructed close enough to Area 3 to be within the zone of intended benefit.
 

 That there is no longer a separate tract of land dividing Area 3 from the Parkway cuts against RF & P’s argument. The diminished distance between Area 3 and the Parkway means that it is all the more important that the covenant is strictly enforced, because it is now more difficult than before to keep uncontrolled development from view. Further, although some may view National Airport, the Crystal City development, and a commuter Metro rail line as unsightly, and there is evidence the Park Service so views them, the record does not support the proposition that large-scale commercial development of Area 3 would be without serious impact on the aesthetics of the Parkway. In light of the covenant’s purpose, it cannot be said unequivocally that conditions have changed so radically as “practically to destroy the essential objects and purposes of the agreement.”
 
 Id
 

 It would seem that the greatest change has been in the economics of the railroad industry. With the onset of various technological changes, railroad use has diminished, making owners of railroad yards look for more lucrative ways to use their
 
 *657
 
 property. However, “[e]quity should never permit one to violate wilfully a solemn covenant, voluntarily made, simply because to do so would enrich him.”
 
 Id.
 
 52 S.E.2d at 60. Because the circumstances have not changed sufficiently to warrant nullifying the covenant, we conclude that the covenant is fully enforceable, and that the Government has not breached the Indenture by indicating that it will enforce the covenant.
 

 Finally, it must be noted that, regardless of RF & P’s labeling the complaint as breach of contract, the so-called contract is a land transfer agreement, governed by Virginia property law. And under Virginia property law, there is no provision or precedent allowing monetary damages for insisting on one’s rights under a restrictive covenant. To allow such a claim would be to cast a shadow of uncertainty over all land-use restrictions, creating liability in those who, in good faith, rely on covenants.
 

 F.
 
 Fifth Amendment Taking
 

 If the Government has deprived RF & P of some possessory interest in property, or wrongfully restricted use of property, RF & P may assert a taking.
 
 See, e.g., First Evangelical Lutheran Church of Glendale v. County of Los Angeles,
 
 482 U.S. 304, 318, 107 S.Ct. 2378, 2387-88, 96 L.Ed.2d 250 (1987);
 
 Loretto v. Teleprompter Corp.,
 
 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982);
 
 Hendler v. United States,
 
 952 F.2d 1364 (Fed.Cir. 1991). However, as shown above, the covenant’s restrictions are still valid, and so RF & P was deprived of nothing. Therefore, the government’s assertions did not amount to a taking; the government was simply asserting an interest that it properly possessed.
 

 III. CONCLUSION
 

 The Court of Federal Claims did not err in finding that jurisdiction was proper, that the Government did not violate the Indenture, and that there was no taking. Accordingly, the judgment of the Court of Federal Claims is
 

 AFFIRMED.
 

 [1]
 

 . In addition to the section 1500 issue here discussed, there is a question as to whether the Court of Federal Claims had proper jurisdiction to hear a case based on a land-transfer agreement. Although this case involves a land-transfer agreement, the relationship between RF & P and the United States is a "conventional or contractual relation within the meaning of [28 U.S.C. § 1491(a)].”
 
 Deterding
 
 v.
 
 United States,
 
 107 Ct.Cl. 656, 661, 69 F.Supp. 214, 216 (1947).
 
 See also Coggeshall Development Corp.
 
 v.
 
 United States,
 
 23 Cl.Ct. 739 (1991). Therefore, jurisdiction was and is appropriate.
 

 [2]
 

 . Since we find that the jurisdictional flaw was subsequently cured, we need not address the question of whether, though filed on the same day, the suit in the Court of Federal Claims might have been the first filed and therefore possibly entitled to the benefit of the rale in
 
 Tecon Engineers. See Tecon Engineers, Inc. v. United States,
 
 343 F.2d 943, 170 Ct.Cl. 389 (1965),
 
 cert. denied,
 
 382 U.S. 976, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966);
 
 Hardwick Bros. Co. II v. United States, 72
 
 F.3d 883, (Fed.Cir.1995).
 

 [3]
 

 . On the distinction between the displacement of state law and the displacement of federal-law reference to state law for the rule of decision, see
 
 Boyle,
 
 487 U.S. at 507, n. 3, 108 S.Ct. at 2516, n. 3. As in Boyle, “if the distinction between displacement of state law and displacement of fed
 
 *655
 
 eral law's incorporation of state law ever makes a practical difference, it at least does not do so in the present case.”
 
 Id.