**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 16, 2020

*Stznc, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 16, 2020

*Susan L Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RANDOLPH PETERSON, | ) | |
| | ) | |
| Petitioner, | ) | No. 97410-1 |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF REVENUE, a | ) | |
| state agency, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |
| | ) | |
| PORT OF BENTON, a Washington | ) | |
| port district, and BNSF RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| JASON MOUNT, JAMES | ) | |
| SUMMEY, PEGGI DOGGETT, | ) | |
| JENNIFER HARTSFIELD, and | ) | |
| MANDI OUKROP, | ) | |
| | ) | Filed  April 16, 2020 |
| Petitioners. | ) | |
| _____ | ) | |

1

GONZÁLEZ, J.— Many delegates to our state constitutional convention were suspicious of corporate influence on government.  The constitution those delegates drafted establishes that no municipality may "give any money, or property, or loan its money, or credit to or in aid of any . . . corporation, except for the necessary support of the poor and infirm."  CONST. art. VIII, § 7.

More than 70 years ago, two railroad companies helped the United States Atomic Energy Commission build a track to the Hanford Nuclear Reservation in return for the right to use the track without paying rent.  After the nuclear reactors at Hanford were decommissioned, the United States transferred nearly 800 acres, including the track at issue, to the Port of Benton (Port), subject to existing agreements and potential reversion to the United States if certain conditions were not met.

The Port has continued to honor the agreements and operate the railroad.  The Port's decision not to charge rent was challenged by a taxpayer, Randolph Peterson, as an unconstitutional gift of public funds.  This challenge was dismissed at summary judgment.  On the record before us we do not find a constitutional violation and affirm.

FACTS

During the Second World War, the War Department of the United States government used its eminent domain powers to acquire hundreds of square miles

near the Columbia River in southeast Washington in order to build the Hanford

Nuclear project. *Hutchinson v. Port of Benton*, 62 Wn.2d 451, 452, 383 P.2d 500

(1963). In 1947, the Atomic Energy Commission and two railroads agreed to build

the 5.4 mile railroad spur at issue to provide a second railroad track into the

Hanford Nuclear Reservation. This track is now known as the Richland Trackage.

BNSF Railway Company and Union Pacific Railroad Company are the successors

in interest to the original contracting railroads. *BNSF Ry. Co. v. Tri-City &

Olympia R.R. Co.*, 835 F. Supp. 2d 1056, 1058 (E.D. Wash. 2011). In return for

their assistance, the United States government gave the two railroads the right to

use the Richland Trackage rent-free. Over the years, the parties modified the

agreement in small ways, but throughout, the two railroads had the right to use the

Richland Trackage without paying rent, and either the railroads or the United

States could terminate the agreement with varying amounts of notice.

Over the years, some of the land the United States seized during World War

II was sold to the Port. *Hutchinson*, 62 Wn.2d at 452. In 1998, the United States

Department of Energy, the successor to the War Department and the Atomic

Energy Commission, concluded that about 800 acres of industrial property, 26

facilities, and 16 miles of railroad track, including the Richland Trackage, near

Hanford was surplus property and offered to give it to the Port. At the time, the

property was valued at about $5.1 million. The Port and the Department of Energy

entered into a detailed indenture[1] outlining the conditions of the transfer.  The

existing agreements with Union Pacific and BNSF railroads were assigned to the

Port in the indenture, with some modifications.  Under these contracts, either side

could cancel the agreement on six months' notice.  Depending on the

circumstances, cancellation could trigger the United States' reversionary interest in

the property.[2]

Peterson, the plaintiff in this case, is the principal owner of the Tri-City

Railroad Company (TRCY).  In 2000, the Port leased some of its property,

including the Richland Trackage and its interchange with the main line, to TRCY's

predecessor.  TRCY operates a railroad, pays a leasehold tax, and maintains a

portion of the rails running across the Port's property.  *BNSF Ry. Co.*, 835 F. Supp.

---

[1] An indenture is "a writing containing a conveyance, contract or covenant between two or more persons."  J. KENDRICK KINNEY, A LAW DICTIONARY AND GLOSSARY 383 (1893).  Unlike a traditional deed, it often contains the signatures of both parties.  *See also* BLACK'S LAW DICTIONARY 919 (11th ed. 2019).  Indentures are often used to memorialize a covenant running with the land in favor of a railroad and, like deeds, may be recorded.  *See, e.g.*, *Williams v. Ind. Rail Rd. Co.*, 33 N.E.3d 1043, 1048 (Ind. Ct. App. 2015); *Richmond, Fredericksburg & Potomac RR. Co. v. United States*, 75 F.3d 648, 654 (Fed. Cir. 1996).

[2] The indenture provides, in relevant part,

> The Railroad shall be used and maintained for the purposes for which it was conveyed, and if said Railroad ceases to be used or maintained for such purposes, all or any portion of the Railroad shall, in its then existing condition, at the option of Grantor, revert to the UNITED STATES OF AMERICA. If Grantor notifies Grantee or its similarly situated successor(s) that rail service no longer is required, such reversionary interest shall terminate and Grantee shall be free to abandon or convert the use of any portion or all of the Railroad.

CP at 92.

2d at 1060.  That same year, the Port directed TRCY to cancel Union Pacific's right to access the interchange and the leased track.  After negotiation, the parties reached an agreement, and Union Pacific continued to use the track and interchange.  For some time, TRCY or its predecessors-in-interest charged a per-car fee for access to the Richland Trackage.  *Id.*

In 2009, BNSF informed TRCY that it would no longer pay for access to the Richland Trackage.  *Id.*  In response, TRCY physically blocked BNSF from using the track.  *Id*.  Ultimately, a federal court found that BNSF had the right to use the Richland Trackage and enjoined TRCY from preventing access.  *Id.* at 1062-64, 1066.

In 2016, Peterson, in his capacity as a taxpayer, brought this case against the Port and the Washington State Department of Revenue.[3]  Peterson alleged that these government agencies were failing to meet their obligations to collect taxes and that allowing the railroads to use the Richland Trackage rent-free violated article VIII, section 7 and article I, section 12 of our state constitution.  Most relevantly, Peterson argued that rent-free use of the tracks amounted to an unconstitutional gift of public funds.  Later, Peterson submitted an expert declaration that suggested the value of BNSF's rent-free use of the tracks would be between $2,106,000 and $3,159,000 in 2017.  In 2016, the property was valued at

---

[3] The Department of Revenue has since been dismissed from the case.

roughly $50 million, about $25 million of which appears to have been attributable to the Richland Trackage, its associated land, and its structures. BNSF and Union Pacific Railroad intervened on the Port's side and five Port district taxpayers intervened on Peterson's side.

Peterson and the Port (among others) moved for summary judgment. After the summary judgment hearing, Judge James Dixon concluded that the United States Department of Energy's 1998 gift transfer of land and improvements to the Port was adequate consideration for BNSF's rent-free use of the Richland Trackage. The judge granted the Port's motion, denied Peterson's, and dismissed Peterson's claims with prejudice. Peterson initially challenged dismissal on both article VIII, section 7 and article I, section 12 grounds. Br. of Appellants at 2. The Court of Appeals rejected both arguments. Peterson narrowed the issues on review to whether BNSF's continued rent-free use of the Richland Trackage violates article VIII, section 7.

## ANALYSIS

This case is here on review of summary judgment. Our review is de novo. *Schroeder v. Excelsior Mgmt. Grp.*, LLC, 177 Wn.2d 94, 104, 297 P.3d 677 (2013) (citing *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004)). As the challenger, Peterson bears the burden of showing an unconstitutional gift of public funds. *King County v. Taxpayers of King County*, 133 Wn.2d 584, 597, 949 P.2d

1260 (1997) (quoting *Gen. Tel. Co. of Nw. v. City of Bothell*, 105 Wn.2d 579, 588, 716 P.2d 879 (1986)).

The prohibition on gifts and loans was one of the most hotly debated issues at our state's constitutional convention. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 162 (2d ed. 2013). The convention was lobbied heavily, including by some delegates, to allow municipalities to subsidize corporations deemed to be for the public good, especially railroads. *Id.* Ultimately, the lobby attempt failed, and our constitution prohibits gifts of public funds "except for the necessary support of the poor and infirm," which is not at issue here. CONST. art VIII, § 7.[4] By largely prohibiting gifts of public funds, "the framers intended to prevent the harmful 'effects on the public purse of granting public subsidies to private commercial enterprises, primarily railroads.'" *City of Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d 679, 701-02, 743 P.2d 793 (1987) (quoting *City of Marysville v. State*, 101 Wn.2d 50, 55, 676 P.2d 989 (1984)). Our founders did not want gifts and loans given to private parties, but "[t]hey were not

---

[4] Two distinct provisions of our state constitution prohibit or limit gifts of public funds. Article VIII, section 5 restricts the State's ability to give gifts and section 7 governs municipalities. "Although these two provisions are worded slightly differently, this court has held that they have identical meaning, as well as the same prohibitions and exceptions." *CLEAN v. State*, 130 Wn.2d 782, 797, 928 P.2d 1054 (1996) (citing *City of Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d 679, 701 n.13, 743 P.2d 793 (1987)). As a municipal corporation of the State of Washington, the Port is bound by our state constitution. *See* ch. 53.04 RCW.

concerned about the nonspeculative transfer of money from one nonprofit government agency to another." *City of Marysville*, 101 Wn.2d at 55.

For the purposes of article VIII of our state constitution, "a gift is a transfer of property without consideration and with donative intent. 'Receipt of valuable consideration assures that a transaction is not a gift.'" *Gen. Tel. Co. of Nw.*, 105 Wn.2d at 588 (footnote omitted) (quoting *Louthan v. King County*, 94 Wn.2d 422, 428, 617 P.2d 977 (1980)). To determine whether a challenged transaction is in fact a gift of public funds,

> [f]irst, the court asks if the funds are being expended to carry out a fundamental purpose of the government? If the answer to that question is yes, then no gift of public funds has been made. The second prong comes into play only when the expenditures are held to not serve fundamental purposes of government. The court then focuses on the consideration received by the public for the expenditure of public funds and the donative intent of the appropriating body in order to determine whether or not a gift has occurred.

*CLEAN v. State*, 130 Wn.2d 782, 797-98, 928 P.2d 1054 (1996) (citing *Citizens for Clean Air v. City of Spokane*, 114 Wn.2d 20, 39, 785 P.2d 447 (1990); *Taxpayers*, 108 Wn.2d at 702). As the trial court's conclusion that the railroad services of BNSF are not a fundamental government service has not been challenged, we then turn to donative intent and consideration. *See id.*

The parties disagree on what constitutes evidence of donative intent and what consideration is relevant. Peterson argues that donative intent is apparent from the failure to charge rent, among other things, and that only the consideration

paid by the railroad to the Port matters for our analysis. The Port argues that Peterson has offered no evidence of donative intent and that the United States government's transfer of nearly 800 acres, 26 improvements, and 16 miles of track is adequate consideration.

More specifically, Peterson contends that the Port's donative intent is apparent in (1) its "deliberate hiding of its sweetheart arrangement with the railroads from the State Auditor," (2) its "condon[ing]" the railroads' decision not to pay track maintenance fees to his company, (3) its coordinated legal defense with BNSF, and (4) its decision not to charge rent. Pet'rs' Suppl. Br. at 13-15, 18.

Like the trial court, we do not find these facts sufficient to raise a question of donative intent. The assertion that the Port attempted to hide anything from the state auditor is simply not established in this record. Peterson asserts that the Port improperly failed to notify the state auditor during the 2012 and 2015 audits that the railroads were using the Richland Trackage rent-free and without paying a leasehold tax. As authority, he cites the deposition of the executive director of the Port, Scott Keller. Keller acknowledged that the Port had been audited, but nothing in his deposition suggests that the Port breached a duty to disclose the rent-free use of the tracks to the auditor, that leasehold tax was owed, or that there was any deliberate effort to conceal the arrangement. Further, the record itself belies any attempt to hide the indenture. Indentures are regularly recorded, and the

header of the copy of the indenture, included in the clerk's papers, suggests it had been filed with the federal court in 2010.[5] This record does not support an inference that the Port attempted to hide anything from the auditor.

Similarly, the fact that the Port did not insist the railroad pay track maintenance fees to Peterson's company does not show an intent to make a gift. Nor does the fact that the Port and the railroad are coordinating their legal defense in this case. Only the fact that the Port has not charged rent gives us pause. Again, the Port took the Richland Trackage subject to many conditions, including the condition that it honor the agreements with the BNSF railroad. The United States clearly could have cancelled that agreement on six months' notice. It is not so clear that the Port has the unfettered freedom to cancel as well. The indenture preserved a reversionary interest in the United States that could be triggered by a cancellation. At the very least, BNSF would have grounds to seek judicial review if the Port unilaterally attempted to terminate the contract, possibly leading to costly litigation. Thus, the real question is not whether abiding by the existing agreement is evidence of intent to give a gift: the question is whether honoring an agreement and failing to risk litigation is evidence of intent to give a gift. While we can imagine a case where the failure to cancel a contract could ripen into a gift

---

[5] We note that the leasehold tax is imposed on the private lease of public property. RCW 82.29A.030. While the issue is not before us, a cursory review of chapter 82.29A RCW suggests the railroads would not have owed tax on the rent they did not have to pay.

10

of public funds when the municipality had the clear authority to cancel if, year after year, the private company reaped increasing benefits grossly disproportionate to the original consideration. This would be especially problematic if the agreement resulted in significant cost to the taxpayers.[6] But there has been no showing of grossly inadequate consideration to the Port or significant cost to the taxpayers.[7] Nothing in this record creates an inference of donative intent.

Nor is the compensation so grossly inadequate as to suggest donative intent. Peterson contends that the 1998 transfer of land and improvements from the United States to the Port is irrelevant because the Port did not get the transfer from the railroads. He notes that in the baseball stadium cases, the baseball franchise itself paid rent to the municipality and tens of millions of dollars in construction costs in return for the use of the stadium. *See* Pet'rs' Suppl. Br. at 9-10 (citing *Taxpayers of King County*, 133 Wn.2d at 598-601, and *CLEAN*, 130 Wn.2d at 798-99). BNSF has only paid $50,000 to the Port this millennium.

---

[6] We caution that it is not a gift of public funds to make an improvident deal. *See Scott Paper Co. v. City of Anacortes*, 90 Wn.2d 19, 26, 578 P.2d 1292 (1978). In *Scott Paper*, for example, a city had contracted to provide water to a paper company for 25 years at a rate set by a formula. 90 Wn.2d at 22. Before the end of the contractual period, the cost of delivering water exceeded the contract price. *Id.* at 26. The State argued that enforcing the contract amounted to a gift of the difference between the contract price and the cost of providing the water. *Id.* at 31-32. We disagreed. We looked to the time the parties contracted, found that the city "fully expected to profit admirably from its agreements" at that time and found no violation of our state constitution. *Scott Paper*, 90 Wn.2d at 33 ("[I]f intent to give a gift is lacking[,] the elements of a gift are not present, and article 8, section 7 does not apply.").

[7] Peterson has submitted a detailed declaration explaining the burden that modern trains impose on old tracks and the cost of deferred maintenance. Generously construed, it supports an inference that the rent-free use of the tracks will impose maintenance costs on Port taxpayers.

We find no authority for the proposition that the consideration must come from the railroads. It is true that our past cases have usually concerned an alleged gift from the State or a municipality to a private party in exchange for (possibly inadequate) consideration from that private party. *E.g.*, *CLEAN*, 130 Wn.2d 782 (from the State and county to a baseball franchise); *Citizens for Clean Air*, 114 Wn.2d 20 (from the city to a private municipal waste disposal company). But none of these cases *require* that the consideration be paid by the private party. Instead, these cases direct us to evaluate "the consideration *received by the public* for the expenditure of public funds." *CLEAN*, 130 Wn.2d at 798 (citing *Citizens for Clean Air*, 114 Wn.2d at 39) (emphasis added). In this case, the consideration received was from the United States Department of Energy and, presently, is worth about $50 million. Peterson did not provide us with any evidence of the value of the rent-free use of the tracks in 1998, but assuming that value appreciated at the same rate (which is speculative), it was between $210,600 and $315,900 a year at the time. *See* CP at 1542. Peterson simply has not presented evidence that suggests the compensation received by the Port was inadequate, let alone grossly inadequate.

The record does establish that the railroads have benefited from the fact that the Port has honored the agreements they had made with the United States government. However, the fact that a third party benefits is not sufficient to

convert a lawful contract into a gift of public funds. *See Taxpayers of King County*, 133 Wn.2d at 596 (citing *Taxpayers*, 108 Wn.2d at 705); *City of Marysville*, 101 Wn.2d at 58. In *City of Marysville*, for example, we examined the benefits to third parties when a city purchased a private golf course, converted it to a public one, and continued to employ three club employees. 101 Wn.2d at 51. As city workers, the employees became members of the Public Employees' Retirement System (PERS). *Id.* PERS administrators concluded that the three workers were entitled to service credit for their previous work at the golf course and billed the city accordingly. *Id.* The city rejected the bill as an unconstitutional gift of public funds. *Id.* We found that the legislature intended to offer service credit as an inducement for workers to stay on the job in such circumstances, and that the workers had "provided ample consideration for such benefits by remaining on the job after the acquisition." *Id.* at 58-59. Accordingly, there was no unconstitutional gift of public funds. *Id.*

While *City of Marysville* is only loosely on point, it does illustrate a situation where a political subdivision of the State assumed existing obligations and honored them at some cost to itself without violating article VIII, section 7. As the Port points out, Washington law allows the assumption of contracts except where assumption is specifically prohibited by law or would violate public policy. *Puget*

*Sound Nat'l Bank v. Dep't of Revenue*, 123 Wn.2d 284, 288, 868 P.2d 127 (1994) (citing *Schultz v. Werelius*, 60 Wn. App. 450, 453, 803 P.2d 1334 (1991)).

In the alternative, Peterson argues that the existence of donative intent or grossly inadequate compensation should be treated as a question of fact, not law. Pet'rs' Suppl. Br. at 13 n.8 (citing *Casa del Rey v. Hart*, 110 Wn.2d 65, 750 P.2d 261 (1988); *Matter of Estate of Little*, 106 Wn.2d 269, 288, 721 P.2d 950 (1986); *Miebach v. Colasurdo*, 102 Wn.2d 170, 685 P.2d 1074 (1984); *Buckerfield's Ltd. v. B.C. Goose & Duck Farm Ltd.*, 9 Wn. App. 220, 511 P.2d 1360 (1973)). We find these cases unhelpful.

*Little* concerned whether a particular conveyance of real property was a gift or a sale, which would have triggered different consequences under intestacy law. *Little*, 106 Wn.2d at 288. That case turned on the deceased's donative intent, not the donative intent of a municipal corporation. *Miebach* concerned whether Miebach was a bona fide purchaser given his at-least constructive knowledge of significant defects in a sheriff's sale, including the gross inadequacy of the purchase price. *Miebach*, 102 Wn.2d at 175-76. While the court stated that whether Miebach was a bona fide purchaser for value was a mixed question of fact and law, it had no difficulty setting aside the sheriff's sale and reversing the trial court's decision quieting title in the purchaser on the record before it. *Id.* at 181-82. *Casa del Rey* is substantially similar to *Miebach*. *Buckerfield's* concerned

whether a transfer of a boat within a family was a gift or an attempt to hide assets from creditors, which in part turned on whether there was donative intent on the part of the original owner. 9 Wn. App. at 221, 224. None of these cases help us decide whether, in this case, there is a material question of fact on the adequacy of compensation or the existence of donative intent.

## CONCLUSION

The historical events that led up to this case are unusual. The Second World War and its aftermath drove the federal government to seize land and make deals it might not have otherwise made. But the trial court properly found that the Port did not make a gift of public funds when it accepted the land subject to existing contracts, and Peterson has not shown that the Port made a gift of public funds by continuing to honor those contracts. Accordingly, we affirm.

_González, J._

WE CONCUR:

Stephens, C.J.

Wiggins, J PT

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J

Owens, J

Montoya-Lewis, J